1               UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF TEXAS
2                    HOUSTON DIVISION

3
     UNITED STATES OF AMERICA          *    4:13-CR-367-1
4                                      *
     VS.                               *    10:07 a.m.
5                                      *
     DENNIS BARSON, JR., ET AL         *    July 27, 2015
6
     ************************************************************
7
     UNITED STATES OF AMERICA          *    4:13-CR-367-2
8                                      *
     VS.                               *    10:07 a.m.
9                                      *
     DARIO JUAREZ                      *    July 27, 2015
10
     ************************************************************
11
     UNITED STATES OF AMERICA          *    4:13-CR-367-3
12                                     *
     VS.                               *    10:07 a.m.
13                                     *
     EDGAR SHAKBAZYAN                  *    July 27, 2015
14
     ************************************************************
15
                    HEARING ON SENTENCINGS
16          BEFORE THE HONORABLE MELINDA HARMON
                  Volume 1 of 1, Pages 1 - 124
17

18   APPEARANCES:

     FOR THE UNITED STATES OF AMERICA:
19   Mr. Albert A. Balboni
     United States Attorney's Office
20   1000 Louisiana, Suite 2300
     Houston, Texas 77002
21   (713) 567-9726
          and
22   Ms. Adrienne Ellen Frazior
     United States Attorney's Office
23   1000 Louisiana, Suite 2300
     Houston, Texas  77002
24   (713) 567-9726

25

                                                                                   Vol 1 - 2

1                    **APPEARANCES (continued)**

2   **FOR THE UNITED STATES OF AMERICA:**
    Ms. Kristine E. Rollinson
3   United States Attorney's Office
    1000 Louisiana, Suite 2300
4   Houston, Texas  77002
    (713) 567-9726
5
    **FOR THE DEFENDANT, DENNIS BARSON, JR.:**
6   Mr. Philip Harlan Hilder
    Hilder & Associates, P.C.
7   819 Lovett Boulevard
    Houston, Texas  77006-3905
8   (713) 655-9111
         and
9   Mr. William Beriah Graham
    Hilder & Associates
10  819 Lovett Boulevard
    Houston, Texas  77006-3905
11  (713) 655-9111
         and
12  Mr. Quentin Tate Williams
    Hilder & Associates, P.C.
13  819 Lovett Boulevard
    Houston, Texas  77006-3905
14  (713) 655-9111

15  **FOR THE DEFENDANT, DARIO JAUREZ:**
    Mr. Thomas B. Dupont, II
16  Dupont and Dupont
    2500 East TC Jester Boulevard
17  Suite 525
    Houston, Texas 77008
18  (713) 682-1800

19  **FOR THE DEFENDANT, EDGAR SHAKBAZYAN:**
    Mr. Mark John Geragos
20  Geragos and Geragos, APC
    644 South Figueroa Street
21  Los Angeles, California  90017
    (213) 625-3900

22
    Court Reporter:
23  Laura Wells, RPR, RMR, CRR
    515 Rusk, Suite 8004
24  Houston, Texas 77002

25  Proceedings recorded by mechanical stenography.
    Transcript produced by computer-assisted transcription.

vol 1 - 3

1                      **PROCEEDINGS**

2              THE COURT:  All right.  First case, the *United*

3  *States vs. Dennis Barson*, Criminal No. H-13-367, Defendant

4  No. 1.

10:07:39   5              MR. BALBONI:  Mark Balboni for the United States.

6              MS. FRAZIOR:  Adrienne Frazior for the United

7  States.

8              THE COURT:  Good morning.

9              MR. GRAHAM:  William Graham for Dennis Barson

10:07:48  10  along with Tate Williams and Philip Hilder.

11              THE COURT:  Good morning.

12              MR. GRAHAM:  Good morning, Your Honor.

13              THE COURT:  Could you come on up, please, with

14  Dr. Barson.

10:07:59  15              MR. HILDER:  Dr. Barson is present.

16              THE COURT:  You are Dennis B. Barson, Jr.?

17              DEFENDANT BARSON:  Yes, ma'am.

18              THE COURT:  In a previous proceeding you were

19  found guilty of Count 1, conspiracy to commit health care

10:08:27  20  fraud in violation of 18 United States Code Section 1349

21  and in Counts 2 through 20 health care fraud aiding and

22  abetting in violation of 18 United States Code Sections

23  1347 and 2.

24        Dr. Barson, have you had a chance to read over the

10:08:45  25  presentence report that was filed in your case?

1          DEFENDANT BARSON:  Yes, Your Honor.

2          THE COURT:  Have you discussed it with your

3    attorneys?

4          DEFENDANT BARSON:  Yes, Your Honor.

10:08:50    5          THE COURT:  Do you have any questions you would

6    like to ask about the report?

7          DEFENDANT BARSON:  No, ma'am.

8          THE COURT:  Do you feel you understand what is

9    contained in the report?

10:08:59    10          DEFENDANT BARSON:  Yes, ma'am.

11          THE COURT:  Do you have any additional objections

12    to the report that were not made by your attorneys on your

13    behalf?

14          DEFENDANT BARSON:  No, Your Honor.

10:09:10    15          THE COURT:  All right.  Let's get started with

16    the objections.  The Government's first objection or I

17    guess your only objection is to the obstruction of

18    justice?  Are you still maintaining that?

19          MR. BALBONI:  Yes, Your Honor.

10:09:22    20          THE COURT:  Could you just give me a little

21    argument.

22          MR. BALBONI:  Yes, Your Honor.  If the Court

23    recalls, of course, Dr. Barson testified in his own

24    defense and his testimony from beginning to end, in the

10:09:35    25    Government's opinion, was manufactured, was structured in

1    such a way as to explain and excuse every possible area of

2    culpability.

3         Just for example, when we're talking about the

4    Medicare application, he said, "I only saw four pages, and

10:09:54    5    I didn't even read them."

6         "I didn't ask whether he was certified."

7         He signed the EDI agreement.  He didn't read the

8    certification language there or the second certification

9    language in that document.  He didn't read the pages, he

10:10:08   10   told us, or ask for the rest because he trusted

11   Mr. Shakbazyan, the man he had just met that day.

12        The same thing at the -- or a little bit different at

13   the bank.  He told us that, yes, he was there.  He

14   couldn't deny his signature.  But if you recall the

10:10:22   15   fantastic testimony that he portrayed to the jury that he

16   sat side by side with Mr. Shakbazyan; and Mr. Shakbazyan

17   provided to the bank representative things such as the

18   mailing address of the clinic, the phone number for the

19   clinic.

10:10:40   20        It was just from beginning to end, as I said, a

21   fabrication.  I don't believe that from start to finish

22   that more than 40 percent of his testimony was factual.

23        That's the Government's position, Your Honor.

24             THE COURT:  All right.  Response?

10:11:01   25             MR. GRAHAM:  Your Honor, Dennis Barson testified

Vol 1 - 6

```
 1   truthfully at trial.  It may have been inconvenient that
 2   he made stupid decisions.  Everything he said was
 3   truthful.  The jury could have and I believe did convict
 4   him on the basis of deliberate ignorance all of which --
 5   they could have believed all of his testimony and still
 6   convicted him.  I believe they did so.
 7        He testified truthfully, and there is no basis for
 8   that objection proposed by the Government.
 9        THE COURT:  Well, of course, I was here and
10   listened to the testimony.  I agree with Mr. Balboni that
11   much of it was not credible; and because he testified not
12   credibly or untruthfully, that does -- that is an
13   obstruction of justice.
14        So I'm going to grant the Government's motion and will
15   add another two points to make it 32, at least at this
16   point.
17        All right.  Now your objections, can you tell me about
18   those, please.
19        MR. GRAHAM:  Sure, Your Honor.  Do you want to
20   address them in order?
21        MR. HILDER:  Judge, just for the purpose of the
22   record, we're going to object to the reasonableness of the
23   Court's decision on the basis of that.
24        THE COURT:  Objection is overruled.
25        MR. HILDER:  Thank you.
```

1    MR. WILLIAMS:  Judge, the objections for Dennis

2  Barson where would you like?  Would you like to go in

3  order?

4    THE COURT:  Yes, please.

10:12:36  5    MR. WILLIAMS:  The first objection relates to the

6  offense conduct in general.  That's -- we know that the

7  PSIR contains information that was not admitted at trial

8  and wasn't admissible at trial.  He contested every

9  allegation, and we understand that currently the Fifth

10:12:56  10  Circuit allows matters that are inadmissible at trial to

11  be used in a PSIR.  However, we have to -- under Fifth

12  Circuit precedent we have to make the objection to

13  preserve error.

14    THE COURT:  Your objection is overruled.

10:13:08  15    MR. WILLIAMS:  The six level adjustment for the

16  number of victims in Paragraph 45, Barson objected to that

17  for a number of reasons.  We briefed this pretty

18  thoroughly.  Essentially, it boils down to three

19  components.  The first is the legislative history of the

10:13:27  20  enhancement suggests that this is not the type of conduct

21  for which it was created.  What happened as we briefed was

22  that there were a number of identity-theft-type cases

23  where there were insured losses, say for example, credit

24  cards, that sort of thing; but people still had to go

10:13:43  25  through the pain and trauma of having to fix their credit.

1    There were noneconomic harms.

2         In a Federal health care program such as Medicare that

3    doesn't happen.  There are no co-pays.  It doesn't affect

4    their credit.  There is no non-economic loss that has to

10:13:58   5    be addressed that turns these people into victims.  It

6    doesn't fit the legislative history.

7         Secondly, the people involved aren't victims in any

8    sense of the word.  As the Government argues, in fact, in

9    its own forfeiture pleadings these were people that were

10:14:12   10   paid to come to the clinic.  If anything, they are

11   unindicted co-conspirators.  And to then convert them into

12   victims is inequitable and inappropriate.

13        Lastly, there is an issue with the ex post facto

14   violation.  Although the conspiracy -- and I recognize the

10:14:30   15   conspiracy of which he was alleged and convicted goes into

16   the spring of 2010.  This application note didn't take

17   effect until November 1st of '09 or thereabouts.  The

18   actual alleged use of identifying information, which is

19   the source of the enhancement under the application notes,

10:14:50   20   was completed well before that date.  All of the

21   substantive acts were completed well before that date.

22        And so, our argument is that the application of that

23   note to number of victims because the use, which is the

24   subject of that enhancement, was actually completed in the

10:15:08   25   summer and early fall of 2009 prior to the effective date

1    of the enhancement that its application to Dennis Barson

2    is an ex post facto violation.

3              THE COURT:  All right.  Mr. Balboni?

4              MR. BALBONI:  Yes, Your Honor.  As we responded

10:15:25    5    to the allegations of the position I think of both

6    Dr. Barson and Mr. Shakbazyan, the ex post facto argument

7    must fail specifically because, first of all, the

8    guidelines choice for the Court was either 2009, which is

9    the offense, or 2015 now or '14 as far as the date of

10:15:51   10    sentencing.

11         Between the two, you would have ex post facto issues

12    with 2014.  So we backed it to 2009.  The 2009 guidelines

13    go into effect on November 1st of 2009 and, of course, the

14    last acts of the conspiracy occur in February of 2010,

10:16:10   15    making the 2009 guidelines the applicable guidelines.

16         Once you determine that they are, in fact, the

17    applicable guidelines and the note which is -- I'm sorry,

18    Your Honor.  I have lost the cite for the note.  Oh, there

19    it is.

10:16:40   20    2B1.1 at Note 4(E) applies and it says that a victim

21    includes any individual whose means of identification was

22    used unlawfully or without authority.

23         I guess there could be an argument that to some extent

24    maybe it was used with authority.  Although, the evidence

10:16:53   25    is that the people that were paid went one time; but their

1    information was used multiple times to bill Medicare for

2    dates of service where they weren't even present.  Also,

3    they are definitely being used unlawfully.  That is their

4    Social Security numbers, their HIC numbers, their names

10:17:11    5    and the like are being used to bill Medicare fraudulently.

6        So, therefore, under either of the prongs I believe

7    that we have here a victim; and we certainly have well in

8    excess of 250.

9        THE COURT:  All right.  I'm going to -- I think

10:17:28    10    that the Government has the argument on this one.  So I'm

11    going to overrule your second objection about the six

12    level adjustment for number of victims.

13        MR. WILLIAMS:  Your Honor, the third objection is

14    to the lack of a mitigating role reduction which

10:17:44    15    specifically objects to Paragraphs 34 and 47; and Barson

16    objects to the characterization of him as an average

17    participant and the lack of reduction for his mitigating

18    role pursuant to 3B1.2.

19        We contend that he should receive a 4 point downward

10:18:03    20    departure for his mitigating role.  The preponderance of

21    the evidence at trial, according to Agent Caddel, was that

22    he did provide a mitigating role in that -- by him closing

23    the account that he closed at Wells Fargo in August of

24    2009 that caused, you know, after his suspicions about

10:18:21    25    Shakbazyan and what was happening when he closed that

1    account that caused hundreds of thousands or exact amount

2    to be almost $200,000 to be returned to Medicare, to CMS

3    and its administrative contractor Trailblazer because that

4    money was bounced and, in fact, saved money to the

10:18:43   5    Government.

6        In fact, the applications notes say that the lack of

7    the defendant's knowledge or understanding of the scope

8    and structure of the enterprise and what the other people

9    are doing also supports this, the role of a minimal

10:18:56   10   participant.

11       As Adrienne Frazior herself argued at the close of the

12   trial, this was a deliberate ignorance case.  There was

13   instruction on it.  The Government sought it.  Your Honor

14   granted it after we had a charge conference about it.  It

10:19:10   15   was argued to the jury that this man did not understand

16   the full scope of the conspiracy and the activities of

17   which he was convicted.

18       And so, in fact, his conduct, if you believe that he

19   did learn in the early fall of '09, in shutting down the

10:19:28   20   account mitigated Medicare's loss.  And, therefore, the

21   role reduction is appropriate.

22       MR. BALBONI:  First of all, deliberate ignorance

23   is not as Mr. Williams describes.  It's not that you don't

24   know what is going on.  It's that you do know what is

10:19:45   25   going on, and you choose to ignore it.  So we will put

1    that aside for the time being.

2        As far as average participant, without Dr. Barson's

3    participation this scheme would have gone nowhere.  He was

4    the one who set up the bank account.  He is the one who

5    set up the Medicare provider number.  He is the one who

6    used his bona fides, if you will, with Medicare to start

7    the ball rolling for this scheme to eventually come to

8    fruition.  And so, I think that it may even be generous to

9    list mister -- or characterize Dr. Barson as only an

10   average participant.

11       THE COURT:  I agree.  I'm going to overrule the

12   Objection 3 to Paragraphs 34 and 47.

13       MR. WILLIAMS:  Your Honor, our fourth objection

14   is related to what Mr. Balboni just discussed; and it's to

15   the abuse of position of trust enhancement in Paragraphs

16   34 and 47.

17       We object to the two-point enhancement for abuse of

18   trust pursuant to 3B1.3 because it's based solely on his

19   application and approval by Medicare as a Medicare

20   provider.  It doesn't look to what he actually did to

21   facilitate the commission of the offense and abuse his

22   trust.  Dr. Barson, after that process of getting the

23   application, signing it, regardless of whether he read it

24   or not, that is as much conduct as he took at that point.

25   The application and the bank account in furtherance of

1    this scheme is -- you know, whether he chose to ignore it

2    as Mr. Balboni argues today or he just -- he didn't do the

3    things that he should have done to discover.

4         The bottom line is he didn't take anything or do

5    anything affirmatively after that to abuse the trust that

6    Medicare gave him.  He basically did what numerous other

7    Medicare providers that work in institutions do.  He

8    signed a contract, which is contained within the

9    application.  He signed the electronic deposit forms, and

10   that's it.  He didn't do anything after that.  He wasn't

11   involved in the billing.  We never determined exactly

12   where the billing occurred, and he didn't do anything

13   affirmatively after that to abuse his trust.

14        And we think that for the abuse of trust enhancement

15   it requires looking at conduct beyond the initial

16   application.  So we think it's appropriate -- the

17   enhancement is inappropriate.

18        He also didn't do anything to conceal the offense.

19        MR. BALBONI:  Your Honor, I think again this is,

20   as I said just earlier, Medicare is a huge, to put it

21   mildly, bureaucracy.  It is charged with the

22   responsibility of paying for the medical care of tens of

23   millions if not hundreds of millions of individuals.  It

24   has under its jurisdiction, if you will, probably over a

25   million doctors.  It runs on trust.  It runs on the faith

1    that a medical doctor or a doctor of -- a D.O. or an M.D.

2    that when they sign the application and they say I am the

3    person who is running this clinic and I am going to abide

4    by all the Medicare rules and regulations, that is the

10:23:23    5    person they see, if you will, since they never see the

6    individual, is Dr. Barson.  And at that point, they are

7    trusting him to abide by all the rules and regulations and

8    to not get involved in a scheme to cheat the system.

9        If the Court needs further evidence of Mr. Barson's or

10:23:44   10    Dr. Barson's role, when he -- according to Mr. Williams --

11    discovered that things just weren't right, he went and

12    closed the bank account.  What Medicare directed him to do

13    under all the guidelines that he said he knew and he was

14    going to observe was to alert them to the fraud, not to go

10:24:06   15    to the bank and close it out, take his piece and move on

16    but to alert Medicare that he just discovered that this

17    massive fraud was going on using his provider number; and

18    he didn't do that.

19        THE COURT:  I think that the Fifth Circuit has

10:24:28   20    addressed this issue in the *United States vs. Miller*, 607

21    F.3d 144 at 148 through 150, a 2010 opinion, in which the

22    Court says by granting the DME provider a license to

23    provide durable medical equipment the Government entrusted

24    her to provide good faith, accurate information in seeking

10:24:58   25    reimbursement from Medicare and Medicaid.  Miller's

```
        1    success in exploiting the lack of Government monitoring
        2    vividly demonstrates that her position provided the
        3    freedom to commit a difficult-to-detect wrong which is the
        4    primary trait of one who holds a position of trust.
10:25:17  5        And definitely Dr. Barson would -- we could replace
        6    his name with that of the defendant Miller.
        7        So I'm going to overrule the objection to number --
        8    the Objection No. 4, abuse of position of trust
        9    enhancement, Paragraphs 34 and 47.
10:25:35 10        MR. WILLIAMS:  Your Honor, Dr. Barson's fifth
       11    objection relates to the other criminal conduct that was
       12    included in Paragraphs 58 to 60 in the PSIR.  The
       13    allegations contained within the PSIR are highly
       14    prejudicial and not the subject of any proper criminal
10:25:52 15    history points.
       16        For the details with that area that we identified in
       17    our objections written, none of these things resulted in
       18    conviction; and some of them didn't even result in arrest.
       19    And their inclusion is inappropriate.  So we object to
10:26:12 20    their inclusion in the PSIR as prejudicial and likely to
       21    adversely affect Your Honor's judgment.
       22        THE COURT:  I'm sorry?
       23        MR. WILLIAMS:  Likely to adversely affect Your
       24    Honor's judgment of this defendant based upon improper
10:26:25 25    considerations of conduct that's not even criminal.
```

1          THE COURT:  Well, I think you know that probation

2     officers one of their tasks is to provide information

3     about the defendant in order to give a full picture of the

4     person.  So, I mean, it doesn't affect the guideline

10:26:48  5     calculations.

6          MR. WILLIAMS:  I understand that, Your Honor; but

7     Your Honor has -- guidelines are only advisory.  Your

8     Honor looks at things well beyond just the guidelines

9     under 18 U.S.C. 3553.  The inclusion of these allegations

10:27:03  10    that aren't criminal and are highly prejudicial, we have

11    to object to preserve error in the Fifth Circuit.

12    Otherwise, they will claim, oh, you didn't object.  You

13    waived it.  I'm trying to preserve error, Your Honor.

14         THE COURT:  I understand.  I'm going to overrule

10:27:17  15    your Objection No. 5.

16         MR. WILLIAMS:  The sixth relates to restitution,

17    objections to Paragraphs 107 to 113; and the -- the

18    objections to the restitution fall in a couple of areas,

19    as we've briefed therein.  So I'll just kind of summarize.

10:27:38  20         Firstly, the restitution amount isn't supported by the

21    evidence.  The restitution amount includes the entire

22    amount paid by Medicare in this case, but that's not the

23    evidence at trial that was all fraudulent.  In fact, if

24    Your Honor recalls Government Exhibits 30 to 37, there

10:27:56  25    were a number of procedures that had nothing related to

1    the anal and rectal tests in the two specific billing

2    codes that the Government focused upon that they did not

3    provide evidence as to what was actually paid related to

4    those.  They provided evidence, as we cited herein, as to

10:28:14  5    what was billed -- excuse me.  I need to get something --

6    but not what was paid.  And none of the testimony from the

7    various witnesses indicated that the other procedures

8    billed and paid did not incur.

9        And so, there is not enough evidence to support that.

10:28:35  10   Specifically, the codes that the Government exclusively

11   focused on with only a subset of patients -- although it

12   wasn't in doubt or dispute that the codes for 51784 and --

13   which is the EMG studies of the anal and urethral

14   sphincter and, also, the code for the rectal tone and

10:29:00  15   compliance test, that they weren't performed on anyone.

16   There were a number of other procedures other than those

17   two that there was no evidence to show that should not

18   have been paid by Medicare.  And so they didn't meet their

19   burden to show that the entire amount of $1.18 million is

10:29:22  20   appropriate restitution.

21       Secondly, the restitution and forfeiture amount to an

22   impermissible double recovery.  And I recognize that the

23   Fifth Circuit has addressed this.  However, I think that

24   this is an issue ripe for granting of a writ of certiorari

10:29:44  25   because there is a small Circuit split on it.  So we have

```
          1    objected to preserve that error.  Another Judge on this
          2    floor has in fact in 11-CR-861 allowed forfeiture and
          3    restitution to offset each other because there is only one
          4    United States of America.  And the Government is the
10:30:03  5    victim, and it is also the prosecutor.  So the forfeiture
          6    and restitution are both going to the United States of
          7    America.
          8         Prior case law, again in the Fifth Circuit, has said
          9    it's not an impermissible double recovery.  We want to
10:30:21  10   object to both, an order of both or them not offsetting
          11   each other in order to preserve error.
          12        And then, we think that even if Your Honor finds that
          13   the restitution amount was proven up by the Government as
          14   to all patients -- which it wasn't.  They only called a
10:30:44  15   handful -- it should be limited to the specific codes that
          16   it actually produced evidence on and not all procedures.
          17   And that was knowable.  It was not done, and it -- and as
          18   a result, the only evidence that should be admitted for
          19   restitution purposes relates to the Code 91120, which was
10:31:17  20   the other, the rectal, sensation, tone and compliance, and
          21   51784 and the amount paid related to those particular
          22   procedure codes.
          23        Unfortunately, the Government did not submit specific
          24   evidence of those.  It only submitted in Exhibit 32 and
10:31:34  25   elsewhere the amount billed for those codes.  So it hasn't
```

1    met its burden on a restitution number.  And while Your

2    Honor can reasonably estimate, this requires a little more

3    information to go from the billed amount, which is almost

4    twice what was actually paid in the aggregate in this

10:31:55    5    case, to the amount paid for those two particular codes,

6    which are the only ones the evidence focused on at trial.

7              THE COURT:  Okay.

8              MR. BALBONI:  Yes, Your Honor.  First of all,

9    starting back at the indictment, in Paragraph 18 it says

10:32:10   10    that the defendants did cause Medicare to be billed for

11    procedures including rectal sensation tests and EMG

12    studies which were never performed.

13         The second, Paragraph 19, the next paragraph talks

14    specifically about Medicare being billed for procedures

10:32:26   15    totaling approximately $2.1 million.  That is, in fact,

16    the total amount of the billing and not the billing just

17    associated with the two mentioned tests.  There is no

18    doubt that those two tests were the focus of the

19    prosecution; but the witnesses testified that they didn't

10:32:45   20    get any tests, for the most part, when they were at --

21    when they were at this clinic.  Keeping in mind, also,

22    that they were paid to go to the clinic.

23         Also, both at the beginning of the trial and at the

24    end of the trial, Dr. Barson's lawyers argued to the jury

10:33:04   25    and I think also to the Court outside the presence of the

1  jury that they were not contesting the fraud.  The fraud

2  was not at issue in their case.  As a matter of fact, I

3  believe in closing argument they even told the jury that

4  the Government wasted their time by calling Yvonne Luckie

10:33:22  5  to even discuss whether or not the underlying claims were

6  fraudulent or not because they weren't disputing it.  So I

7  think, Your Honor, that under relevant conduct they are in

8  fact -- I'm sorry, Dr. Barson is, in fact, responsible for

9  the entire amount.

10:33:42  10      With respect to the double counting, as Mr. Williams

11  indicated, the Fifth Circuit law indicates that it is not

12  double counting.  And, nonetheless, from a practical

13  standpoint the United States doesn't -- any moneys

14  obtained from forfeiture is applied against the

10:34:00  15  restitution amount.  So there is no double counting.

16  There is no double dipping.  If a dollar is taken from

17  Defendant Barson then that dollar will be credited towards

18  the restitution amount.

19      MR. WILLIAMS:  Your Honor, the issue is twofold.

10:34:15  20  First of all, arguments are not evidence.  And the

21  restitution order for sentencing is substantively

22  different than the conviction for the fraud itself.  And

23  the Government had the opportunity to present evidence

24  that all of the other billing codes were fraudulent, and

10:34:33  25  it didn't do it.

1    Secondly, it also had the opportunity to present the

2    amount paid with respect to the two billing codes rather

3    than just the billed amount.

4        And restitution is to repay the Government for amount

10:34:48   5    paid, not amount billed that it didn't pay.  So the amount

6    billed is irrelevant.  It's the amount paid by the

7    Government fraudulently that is relevant here.  And the

8    Government did not prove that number.  It did not put

9    enough evidence in the record for Your Honor to even make

10:35:03   10   a safe estimation of that amount because it did not choose

11   to summarize the amount paid for the two billing codes

12   that it focused upon.

13       So the restitution order for the amount sought is not

14   supported by the evidence let alone a preponderance of the

10:35:22   15   evidence.

16       Secondly, Your Honor, under the Fifth Circuit while

17   the Government may apply money collected against one order

18   first it is still two separate orders that have to be

19   fulfilled that will stand until both are paid.

10:35:38   20       So the double count issue we have briefed.  Your Honor

21   can make a ruling as you see fit.  We're just trying to

22   preserve the error to -- preserve the issue for appeal,

23   depending upon how you rule.

24       But the focus for the number itself has to be based on

10:35:56   25   evidence in the record, and the amount sought has not been

1    proven to be the total amount fraudulently paid by

2    Medicare as a result of the fraud in this case.  And as a

3    result of that, the guidelines calculation is off.

4              THE COURT:  Do you understand what he is saying?

5              MR. BALBONI:  Yes, Your Honor.

6              THE COURT:  Can you respond to it then, please.

7              MR. BALBONI:  He is basically saying that the

8    United States did not meet its burden I believe is what he

9    is saying.

10             THE COURT:  Yeah.

11             MR. BALBONI:  I would take issue with that, Your

12   Honor.  First of all, as I said, we discussed it with

13   every beneficiary we called.  We cannot call -- if we had

14   called 429 beneficiaries, I don't believe the Court would

15   be happy.  I don't think the jury would be happy.

16        And so, what we do is we pick a representative sample.

17   They came in.  They testified to the fact that they were

18   paid to go, that they didn't have the testing that was

19   done, not just the anal and rectal testing but all of the

20   testing.

21        The claims themselves are fraudulent from many

22   different perspectives in terms of the preponderance of

23   the evidence.  Medicare believes that Dr. Barson is doing

24   the work at his clinic.  Every claim that goes in goes

25   with his imprimatur that he, in fact, performed the

10:36:21  (line 5)
10:36:30  (line 10)
10:36:45  (line 15)
10:37:01  (line 20)
10:37:21  (line 25)

1    services or perhaps had a physician's assistant working

2    directly under him to perform them and in some instances

3    the procedures.

4          But we know from the evidence for certain and from

10:37:36    5    Dr. Barson's own testimony he was never there.  He never

6    saw a patient.  And so, he was -- even though his number

7    was being used and Medicare thought Dr. Barson was the

8    physician, in fact, Dr. Dario, Mr. Juarez was, in fact,

9    the only person there pretending to be a doctor.

10:37:55   10          So I think the Court has more than a preponderance of

11   the evidence upon which to base its decision that the

12   entire $2.1 million billed to Medicare is as a result of

13   fraudulent procedures.

14          THE COURT:  The $1,188,993.82, which is what the

10:38:25   15   PSR says is restitution, is that dollar amount -- what is

16   that dollar amount, in the Government's view?

17          MR. BALBONI:  That dollar amount is all of the

18   billing, all of the claims filed from the Barson Clinic

19   during the time period of the conspiracy.

10:38:48   20          THE COURT:  Is it the amounts claimed or the

21   amounts paid?

22          MR. BALBONI:  The loss figure for sentencing is

23   the amount billed, the amount claimed.

24          THE COURT:  The amount billed?

10:39:00   25          MR. BALBONI:  That's correct.  I'm sorry.

1    Restitution would be --

2            THE COURT:  The actual.

3            MR. BALBONI:  That's correct.

4            THE COURT:  So that $1.8 -- that $1,188,993.82 is

10:39:16    5    the actual amount that the Government paid to the clinic?

6            MR. BALBONI:  That's correct, Your Honor.

7            THE COURT:  For all the claims?

8            MR. BALBONI:  Yes, Your Honor.

9            THE COURT:  All right.  So it's not the amount

10:39:27   10    billed, which is your argument and that's what I'm not

11    connecting.

12            MR. WILLIAMS:  Judge, the Government only put

13    evidence on that two billing codes were fraudulent.  And

14    when they did that through their Exhibits 32 through 36

10:39:41   15    they said this is how much was billed for those two

16    billing codes.  They never came back and said this is how

17    much was paid for those billing codes.  Everybody knows

18    that you don't get paid everything you bill Medicare.  In

19    this case, as Your Honor just recognized, $2.1 total was

10:39:58   20    billed.  $1.2 was paid.  The Government didn't separate in

21    the evidence out anywhere how much was paid total for the

22    two fraudulent billing codes.

23        So it could have been $100,000.  It could have been

24    $400,000.  We don't know.  We only know how much was

10:40:16   25    billed.  Since they only proved fraud on those two codes,

1   that's where the amount of restitution should be limited

2   to.  And they didn't segregate that amount actually paid.

3       And if it's -- you do not -- the complication and

4   prolongation of the sentencing process to figure that

10:40:34   5   allows you to not to have to enter an order under the

6   mandatory Victim Restitution Act because you don't have

7   the clear, sufficient evidence that's easily determinable

8   today in front of you to say, "Okay.  I know this much was

9   billed on these two codes, but this is how much was paid"

10:40:50   10   because restitution is separate from the loss number for

11   the purpose of the guidelines calculation.

12       $1.2 and $2.1, that's the same loss guideline.  We're

13   talking about restitution.  That's a real dollar number

14   that in a perfect world these three defendants are joint

10:41:06   15   and severally on the hook for and will pay.  Whether that

16   happens or not, we don't know.

17       But we do know that your order has to reflect that

18   actual amount, and you don't have sufficient evidence in

19   the record to render an order with the amount actually

10:41:23   20   paid for the two codes that were proven fraudulent.

21   Mr. Balboni forgets the evidence from the witnesses who

22   testified that they did get EKGs.  They did get all these

23   other things.  You know, a doctor can bill for procedures

24   performed by his staff.

10:41:40   25       And so, not everything that was billed and paid was

 1    fraudulent.  They didn't prove that.  We focused on two

 2    billing codes.

 3                MR. BALBONI:  There is also the medically

 4    necessary prong, Your Honor.

 5                MR. WILLIAMS:  We didn't have a doctor come in

 6    and testify as to that stuff.  The Government has the

 7    burden on that, and under 702 through 6 in *Daubert* that's

 8    specialized testimony and no Government physician came in

 9    and testified that nobody needed an EKG or a physical or

10    any of the other things.

11                MR. BALBONI:  That may be, Your Honor, that we

12    called no doctor to testify.  We didn't want to add a

13    doctor to the mix where we didn't have a doctor present in

14    the first place.

15         Dario Juarez was not a physician's assistant.  He was

16    not a physician.  Yet he was the individual at the clinic

17    day after day ordering the tests.  I would say that that's

18    the end of the analysis.  You have a nonmedical

19    professional ordering medical tests.  I think that's the

20    definition of not medically necessary.

21         The gentleman doesn't have any basis in training or

22    experience to be able to make such a determination so that

23    every diagnostic test, if it was done, and most of them

24    were not, were not medically necessary.

25         Dr. Barson wasn't there to make the call.  He was not

Vol 1 - 27

even -- although, I don't think it would satisfy the
requirements; but he wasn't even telephonically connected
with Mr. Juarez on a daily basis as these patients came to
this clinic didn't come -- as the witnesses told you,
didn't come from medical needs.  They came to get paid.

They all had their own doctors if they truly had a
medical problem.  When they came, they were examined by
Dr. Dario, who then made a medical decision to order
essentially the same tests for every individual who came
in.  And so, therefore, by definition, they are all
medically unnecessary.

MR. WILLIAMS:  That's all outside the record, and
I object to it.  It's -- the evidence before Your Honor
was that --

THE COURT:  Well, what is outside the record?

MR. WILLIAMS:  His characterizations of Dario
ordering tests.  His characterizations that this
individual wasn't available by phone.  There, in fact, as
the evidence in the record will show, there were studies
that were viewed by a radiologist, a Dr. Mednik in
California, that Dr. Barson was available by phone.  There
are other nonphysician practitioners.  There was Amber
Wheeler, a nurse.

So according to Mr. Balboni's theory that Medicare --
again, this is outside the evidence.  That nothing that

1    anybody other than an actual M.D. or D.O. in a doctor's

2    office does is reimbursable.  That's not what the evidence

3    before Your Honor and the record from this trial from

4    Yvonne Luckie or other witnesses was.

10:44:43   5    But the bottom line is the evidence in the record

6    doesn't support the restitution order sought.  It would

7    support, at most, a restitution order for the amount paid

8    to those two billing codes for the tests that were not

9    performed.  Whether other things were performed or not,

10:45:01   10    were necessary, there was no evidence of that.  At the

11    most, it's those two particular codes and the amount paid;

12    and they didn't put that in the record.

13    They put the amount billed in the record; but not the

14    amount paid, which is what a restitution order must be

10:45:15   15    based on.  Restitution is not mandatory where the record

16    and the evidence doesn't support a specific amount.

17    MR. BALBONI:  Just for the record, Your Honor,

18    Amber Wheeler was a brand new medical assistant.  She had

19    no more authority to order diagnostic tests than Dr. Dario

10:45:40   20    or George, the technician.  They require a doctor or a

21    P.A. under adequate supervision.

22    Dr. Barson was in Austin, Texas for the entire period

23    of this conspiracy except when he came to set up the bank

24    account and the Medicare provider number and two or three

10:46:03   25    times when he came to review a small subset of patient

1    files that Dr. Dario provided to him.

2        There is no evidence in the record that a medical

3    physician was ever present at the Barson Clinic.

4        MR. WILLIAMS:  There is also no evidence that one

10:46:24  5    has to be for these other codes to be viable.

6        Your Honor, Government Exhibit 32 on billed amounts

7    says that the EMG was 24 percent.  The rectal sensation

8    was 44 percent.  All other procedure codes, which may not

9    include diagnostic testing as exclusively as Mr. Balboni

10:46:46  10   suggests -- it includes a lot of other things -- but 32

11   percent of the amount billed.  If there was a straight,

12   transitive property of billed and paid, then we should

13   knock 32 percent off the restitution order from the $1.18

14   which would bring it around to about $800,000.  But I

10:46:59  15   don't think that there is any evidence that it is a

16   straight, transitive property that you can say that the

17   amount billed percentages will equal to that.

18        And as a result of that vagueness in the evidence,

19   Your Honor can't enter the restitution order requested.

10:47:14  20        THE COURT:  All right.  I understand your point,

21   but I can't go along with it.  And I know you are going to

22   appeal this.  So we'll give you another appeal point and

23   see what the Circuit says.

24        MR. WILLIAMS:  Thank you, Your Honor.

10:47:28  25        THE COURT:  I'm going to overrule your objections

1    to Paragraphs 107 through 113.

2            MR. WILLIAMS:  I believe that the remaining

3    objections just had to do with the guidelines calculations

4    based upon our objections had they been granted.  So we'll

10:47:49    5    move on, Your Honor.

6            THE COURT:  Okay.  Those will be overruled, too.

7        All right.  I will adopt the presentence report as my

8    own, both the findings of fact and the application of the

9    guidelines to the facts with the exception of the

10:48:13   10    obstruction of justice and find a total offense level of

11    32, Criminal History Category 1, which gives a guideline

12    range of 121 to 151 months.

13        Anything else before I pronounce sentence?

14            MR. WILLIAMS:  Yes, Your Honor.  I would note,

10:48:41   15    having seen the response from the Government in the memo,

16    that in order for that guideline range to be imposed Your

17    Honor would have to impose consecutive sentencing.  I

18    would point out that by statute Your Honor has -- that's

19    discretionary with the Court, not mandatory.

10:49:00   20            THE COURT:  Okay.

21            MR. WILLIAMS:  The statutory maximum for the

22    highest offense of conviction is ten years.

23            THE COURT:  Mr. Balboni, any objection or

24    anything further from you before I pronounce sentence?

10:49:12   25            MR. BALBONI:  No, Your Honor.

1           THE COURT:  All right.  Do you have something

2     more you would like to say?

3           MR. GRAHAM:  Your Honor, if I may, I would like

4     to make a brief argument.

5  10:49:22           THE COURT:  All right.  You may, certainly.

6           MR. GRAHAM:  Your Honor, I would like to point

7     out that Dennis Barson's wife and identical twin brother

8     and parents are here from various parts of the country.

9     His brother came from Virginia; and his parents are here

10 10:49:35   from New Jersey, as they were throughout the duration of

11    the trial.

12           THE COURT:  All right.

13           MR. GRAHAM:  He has a strong support network

14    within his family and among his friends and former

15 10:49:46   colleagues.  He is fortunate that he still enjoys the

16    support of his family in spite of his felony conviction.

17    I would like to ask the Court to please consider the many,

18    many good things about Dennis Barson, some of which are

19    included in the PSIR and also present in the papers that

20 10:50:06   have been filed and reviewed by the Court.  So I won't

21    waste your time rehashing all of them.

22           I would like to point out that he is a veteran and

23    served honorably throughout the War on Terror.  He has

24    always been a hard worker.  He has worked since, you know,

25 10:50:22   he was 15 years old and has ever since.  He took advantage

1  of a scholarship to go to medical school and serve in the

2  Navy thereafter for nearly ten years.

3       The collateral consequences of the conviction -- of

4  this felony conviction for Dennis Barson are immense.

10:50:42  5  They are enormous.  He has lost everything he has worked

6  for for the entirety of his adult life.  A decade in

7  school, in college, the time spent in the military serving

8  veterans aboard an aircraft carrier or in a clinic

9  thereafter.

10:51:02  10       After he got out of the military, he -- due to his

11  tenacity -- accepted a neurology residency in Austin where

12  he came across country alone to work hard and better

13  himself and get that specialization, which ultimately he

14  did achieve and was board certified.

10:51:20  15       The offense conduct at issue in this case occurred

16  over a very short period of time.  The clinic's operations

17  were for a period of a couple of months.  This is -- there

18  is no objection for a downward departure for abhorrent

19  conduct because the length of the conspiracy clearly

10:51:41  20  exceeds a week or two or some very short period of time.

21  But this is abhorrent conduct when considered against the

22  good things Dennis Barson has done throughout his life.

23       He will never practice medicine again, almost certain,

24  with an absolute certainty.  He has lost, basically,

10:52:04  25  20 years of his life working to where he was at the time

1   of this offense.  He has never -- he wasn't aware of

2   insurance billing practices, Medicare billing practices

3   having been an able physician.  He wasn't trained as such

4   during his second year of residency when this offense

5   occurred.

6        A sentence at a level of 32 as calculated under the

7   guidelines is -- would be extremely harsh.  It would be

8   far more harsh than is necessary under the 3553(a)

9   factors.  In consideration of all the good things about

10  Dr. Barson I would ask that the Court vary downward

11  significantly from the guidelines as calculated.

12       In the sentencing memorandum a 30-month period was

13  identified, which is significant.  We also ask that he be

14  placed somewhere in Bastrop, which is close to where he

15  lives with his wife and children.

16       A sentence of 10 years or around that range that is

17  calculated would basically -- that would cause Dennis

18  Barson to lose everything.  He has lost a lot, but he

19  still has the support of his family.  He has always worked

20  hard.  He can re-engage.  He can become a productive

21  member of society, and putting him behind bars for that

22  amount of time would serve him no -- would not serve any

23  of the 3553(a) factors and would be unjust.

24            THE COURT:  All right.  Mr. Balboni, response?

25            MR. BALBONI:  Yes, Your Honor, very briefly.

1  Despite Dr. Barson's obstructive testimony and because of

2  his service as a veteran and in some respect because of

3  the obvious support he has from his patients, his

4  co-workers and obviously his family, the United States

10:54:29   5  would ask for a sentence at the very bottom of the

6  guideline, 121 months and, of course, restitution and a

7  forfeiture order in the amount of $1,188,993.82.

8              THE COURT:  I think I have to -- I can't sentence

9  him to more than 120 months; is that right?

10:54:55   10             PROBATION OFFICER:  May I?

11             THE COURT:  Yes?  Is that right?

12             PROBATION OFFICER:  Because he is being sentenced

13  for multiple sentences you are able to stack them.  If I

14  can approach.

10:55:04   15             THE COURT:  Surely.  Surely.

16         (Discussion off the record at the bench.)

17             MR. HILDER:  Excuse me, Judge.

18             THE COURT:  Yes.

19             MR. HILDER:  Dr. Barson would like to address the

10:55:59   20  Court as well.

21             THE COURT:  Of course.

22             DEFENDANT BARSON:  Thank you, Your Honor.  I'm a

23  little nervous.  So I apologize.

24             THE COURT:  That's all right.

10:56:07   25             DEFENDANT BARSON:  Your Honor, I am ashamed to be

1    standing before you today.  I'm ashamed of my stupidity

2    and the decisions I made.  I served my country in the

3    United States Navy and continued treating veterans upon

4    discharge.

10:56:23    5    As a convicted felon I have lost everything I've

6    worked for my entire adult life.  Standing before you

7    today I am dishonored.  My family has also lost a lot, and

8    I am fortunate and blessed to still have their love and

9    support.  I am resilient but don't know that I will be so

10:56:46   10   if I am sentenced for so long that I lose my entire family

11   and must start over years from now without their support.

12       This is my last chance, and I humbly ask the Court for

13   mercy so that I can start over and continue being a father

14   to my three small children and a husband to my wife.

10:57:10   15   Thank you, Your Honor.

16       THE COURT:  Thank you.  Anything else?

17       (No response.)

18       THE COURT:  Dennis B. Barson, Jr., is before the

19   Court this morning for sentencing after being found guilty

10:57:26   20   of one count involving conspiracy to commit health care

21   fraud and 19 counts of health care fraud.

22       Dr. Barson is identified as the medical director of

23   the clinic.  At the direction of Shakbazyan, Barson

24   applied for a Medicare provider number for the clinic and

10:57:46   25   opened a bank account in his name into which the Medicare

1    payments would be deposited.

2         Since Barson resided in Austin, Texas, Barson would

3    travel to Houston every two weeks on Saturday to review

4    ten percent of the patients from the clinic.  Barson never

10:58:05    5    saw a patient.

6         With Barson's Medicare provider number the personal

7    identifying information of at least 429 beneficiaries was

8    used to submit unauthorized and fraudulent claims from

9    various diagnostic tests which included rectal sensation

10:58:19    10    tests and EMG studies of the anal or urethral sphincter.

11    These tests were medically unnecessary and were not

12    requested by the beneficiary or were not provided.

13         Barson is held accountable for fraudulently billing

14    Medicare approximately $2,152,455.  Medicare paid

10:58:44    15    $1,188,993.82.  In the application to become a Medicare

16    provider Barson agreed to comply with the strict

17    requirements of the law for payment of services and to

18    provide for the medical and health needs of the qualified

19    beneficiaries.

10:58:56    20         But by submitting fraudulent claims as a doctor,

21    Barson's criminal conduct in this offense violated the

22    trust of Medicare.  Barson is considered an average

23    participant in this scheme to defraud Medicare.

24         The large amount of money fraudulently obtained over

10:59:14    25    the course of two months is significant, but the defendant

1    has never served a jail term.  And thus, I believe that a

2    term of imprisonment at the statutory maximum is

3    appropriate considering what he -- the crime he committed

4    and in conjunction with the factors listed under 18 United

10:59:40    5    States Code Section 3553(a), which is also below the

6    guideline -- the bottom of the guideline range of

7    121 months.

8         This sentence would adequately reflect the seriousness

9    of the offense, promote respect for the law and provide

10:59:58    10   deterrence to future criminal conduct and address the

11   defendant's background and characteristics.

12        A three-year term of supervised release as to each of

13   Counts 1 through 20 to run concurrently for a total of

14   three years would be adequate to allow for monitoring and

11:00:15    15   to provide the defendant with the necessary time to

16   address any criminal monetary penalties imposed.

17        Based upon his financial profile and the substantial

18   amount of restitution owed I believe that Dr. Barson does

19   not have the ability to pay a fine within the prescribed

11:00:36    20   guideline range or even a reduced fine.

21        Pursuant to the Sentencing Reform Act of 1984 it's the

22   judgment of the Court that the defendant, Dennis B.

23   Barson, Jr., is hereby committed to the custody of the

24   Bureau of Prisons for a term of 120 months as to each of

11:00:59    25   Counts 1 through 20 to be served concurrently for a total

1    term of 120 months.  This is the maximum statutory

2    penalty, and a sentence below the calculated guideline

3    range of 121 months.

4         Upon release from imprisonment the defendant shall be

11:01:21    5    placed on supervised release for a term of three years.

6    This term consists of three years as to each of Counts 1

7    through 20, all such terms to run concurrently.

8         Within 72 hours of release from the custody of the

9    Bureau of Prisons the defendant shall report in person to

11:01:35    10    the probation office in the district to which the

11    defendant is released.

12         While on supervised release the defendant shall not

13    commit another Federal, State or local crime, shall comply

14    with the standard conditions that have been adopted by

11:01:47    15    this Court under General Order No. H-1996-10, abide by any

16    mandatory conditions required by law and shall comply with

17    the following additional conditions.

18         The defendant shall not possess a firearm, ammunition,

19    destructive device or any other dangerous weapon.  The

11:02:03    20    defendant shall cooperate in the collection of a DNA

21    sample from the defendant if the collection of such a

22    sample is authorized pursuant to Section 3 of the DNA

23    Analysis Backlog Elimination Act of 2000.

24         The defendant is required to provide the probation

11:02:18    25    officer access to any requested financial information, and

1  the defendant is prohibited from incurring new credit

2  charges or opening additional lines of credit without

3  approval of the probation officer.  The defendant is

4  prohibited from possessing a credit access device such as

5  a credit card unless first authorized by the probation

6  officer.

7      The defendant shall participate in a program,

8  inpatient or outpatient, for the treatment of drug and/or

9  alcohol addiction dependency or abuse which may include

10 but not be limited to urine, breath, saliva and skin

11 testing to determine whether the defendant has reverted to

12 the use of drugs and/or alcohol.

13     Further, the defendant shall participate as instructed

14 and as deemed necessary by the probation officer and shall

15 comply with all rules and regulations of the treatment

16 agency until discharged by the program director with the

17 approval of the probation officer.

18     The defendant shall further submit to such drug

19 detection techniques in addition to those performed by the

20 treatment agency as directed by the probation officer.

21 The defendant will incur costs associated with such

22 drug/alcohol detection and treatment based on ability to

23 pay as determined by the probation officer.

24     It is further ordered that the defendant shall pay

25 restitution in the amount of $1,188,993.82 to Medicare

1    payable to the following address:  CMS Division of

2    Accounting Operations; 7500 Security Boulevard; Mail Stop

3    C3-1-03; Baltimore, Maryland, 21244-1850.

4         It is further ordered that the defendant is jointly

11:04:00   5    and severally liable with Dario Juarez, Criminal

6    No. 4:13-CR-367, Defendant 2, and Edgar Shakbazyan,

7    Criminal No. 4:13-CR-367, Defendant 3, to pay restitution

8    in the amount of one million $1,188,993.82 to Medicare.

9    The defendant's restitution obligation shall not be

11:04:28   10   affected by any restitution payments that may be made by

11   other defendants in this case except that no future

12   payments shall be required after the sum of the amounts

13   paid by all defendants has fully covered all the

14   compensable losses.

11:04:41   15        It is further ordered that the defendant shall pay to

16   the United States a special assessment of $2,000.  The

17   Court finds that the defendant does not have the ability

18   to pay a fine and will waive the fine in this case.

19   Having assessed the defendant's ability to pay, payment of

11:04:54   20   the total criminal monetary penalties shall be due, as

21   follows:  The defendant shall make a lump sum payment of

22   $2,000 due immediately, balance due at 50 percent of any

23   wages earned while in prison in accordance with the Bureau

24   of Prisons Inmate Financial Responsibility Program.  Any

11:05:13   25   balance remaining after release from imprisonment shall be

1    due in monthly installments of at least 10 percent of the

2    defendant's gross income to be charged -- I'm sorry -- to

3    be changed during supervision, if needed, based on the

4    defendant's changed circumstances or $200 per month,

11:05:30  5    whichever is greater, to commence 30 days after release

6    from imprisonment to a term of supervision.  Payment is to

7    be made to the United States District Clerk, Southern

8    District of Texas.

9        I will recommend to the Bureau of Prisons that

11:05:43  10   Dr. Barson be allowed to be designated to a facility as

11   close to Bastrop -- well, the facility in Bastrop, Texas;

12   but you understand that they do not have to follow my

13   recommendation?

14        DEFENDANT BARSON:  (Nodding head up and down.)

11:06:00  15        THE COURT:  Dr. Barson, to the extent you have

16   not waived your right to appeal, you have a right to

17   appeal your conviction and your sentence.  If you do not

18   have the funds to provide for an attorney, one will be

19   provided for you along with any transcripts or other

11:06:15  20   documents necessary for such an appeal.  Anything else?

21        MR. BALBONI:  Yes, Your Honor.  A couple of

22   things.  First of all, with respect to the Court's

23   restitution order we ask that that be due and payable

24   immediately, also.

11:06:27  25        THE COURT:  All right.  I will order that the

VOl 1 - 42

1    restitution order be due and payable immediately.

2              MR. BALBONI:  And, also, Your Honor, I believe

3    that the Government has provided a proposed preliminary

4    order of forfeiture with respect to the same amount, one

11:06:45    5    million one --

6              THE COURT:  A preliminary order of forfeiture.

7              MR. BALBONI:  We would ask that the Court make

8    the order of forfeiture part of its final judgment.

9              THE COURT:  Yes.

11:07:15    10             MR. GRAHAM:  Your Honor, we've objected to the

11    order of forfeiture and requested a hearing on that

12    matter.  I believe at least one other defendant has, as

13    well.

14         Under the Federal Rules of Criminal Procedure cited I

11:07:26    15    believe that a hearing has to be conducted.  We weren't

16    sure exactly if you were going to join those matters or if

17    that was -- but we have filed a number of -- both a

18    response and then based on some additional pleadings

19    another response to that additional pleading and sur-reply

11:07:45    20    to the Government's reply.

21         Secondly, we would ask that Dr. Barson be able to

22    self-surrender to the Bureau of Prisons.

23              THE COURT:  Is that okay with you?

24              MR. BALBONI:  With respect to self-surrender?

11:08:00    25             THE COURT:  Self-surrender.

Vol 1 - 43

```
 1              MR. BALBONI:  No objection.
 2              THE COURT:  Then, yes, Dr. Barson, you may until
 3    you are designated to a facility; and you will sign a
 4    document that says you understand that you will report to
 5    the designated facility on the day and at the time
 6    indicated in an order that will be provided in the future.
 7              DEFENDANT BARSON:  Yes, ma'am.
 8              THE COURT:  You understand that.  Okay.
 9         As far as the forfeiture, do we have to have -- do we
10    have to have a hearing?  Do you agree?
11              MS. ROLLINSON:  They have a right to ask for a
12    hearing, Your Honor.  Kristine Rollinson.
13              THE COURT:  Yes.
14              MS. ROLLINSON:  They have a right to ask for a
15    hearing.  They did.  They never got one set, and they can
16    have it right now.  We often do it right at sentencing.
17    But the issues are not all that different from the
18    restitution.  The amount of proceeds we're alleging are
19    the same amount as restitution.  We just ask that a
20    separate order be imposed in accordance with the Fifth
21    Circuit decision.
22              THE COURT:  All right.  Shall we -- well, let's
23    don't do the hearing.  We'll do the hearing for all three
24    defendants after I have completed the sentencing of all
25    three defendants.  How about that?
```

                MS. ROLLINSON:  So long as the forfeiture is made
part of the sentence.

                THE COURT:  Right.  And then the order will -- if
I grant the forfeiture order, then it will be made part of
the judgment.

                MS. ROLLINSON:  Yes, Your Honor.

                THE COURT:  Yes.

                MR. HILDER:  Judge, may I also impose an
objection to the reasonableness of the sentence as well?

                THE COURT:  You may.  Overruled.

                MR. GRAHAM:  Yes, Your Honor.  The Fifth Circuit
requires that we object to it as substantively -- I'm
trying to remember the words -- substantively
unreasonable.

                THE COURT:  Yes.  I understand.  I'm going to
overrule that.

                MR. GRAHAM:  Thank you, Your Honor.

                THE COURT:  All right.  If you all would remain
in the courtroom, or you can take a bathroom break if you
want to.  I need you to come back for the forfeiture
hearing at the conclusion of the sentencing process.

        The next case, Dario Juarez, Criminal No. H:13-367,
Defendant No. 2.

                MR. DUPONT:  Good morning, Your Honor.  How are
you?

1              THE COURT:  Fine.

2              MR. DUPONT:  Todd DuPont for Mr. Juarez.

3              THE COURT:  Sorry?

4              MR. DUPONT:  Todd DuPont for Mr. Juarez.

11:10:13    5              MR. BALBONI:  Al Balboni for the United States.

6              MS. FRAZIOR:  Adrienne Frazior for the United

7    States.

8              THE COURT:  You are Dario Juarez?

9              DEFENDANT JUAREZ:  Yes, ma'am.

11:10:22   10              THE COURT:  I don't think the microphones are on.

11         (Discussion off the record.)

12              THE COURT:  In a previous proceeding you were

13    found guilty of Count 1, conspiracy to commit health care

14    fraud in violation of 18 United States Code Section 1349

11:10:50   15    and Counts 2 through 20 health care fraud in violation of

16    18 United States Code Sections 1347 and 2.

17         Mr. Juarez, have you had a chance to read over the

18    presentence report that was prepared in your case?

19              DEFENDANT JUAREZ:  Yes, ma'am.

11:11:08   20              THE COURT:  Have you discussed it with

21    Mr. DuPont, your attorney?

22              DEFENDANT JUAREZ:  Yes, ma'am.

23              THE COURT:  Do you feel you understand what is

24    contained in the report?

11:11:14   25              DEFENDANT JUAREZ:  Yes, ma'am.

Vol 1 - 46

 1        THE COURT:  And do you have any questions you
 2   would like to ask about it at this time?
 3        DEFENDANT JUAREZ:  No, ma'am.
 4        THE COURT:  Mr. DuPont has made some objections
11:11:27   5   to the presentence report on your behalf.  Do you have any
 6   additional objections you would like to make to the
 7   report?
 8        DEFENDANT JUAREZ:  No, ma'am.
 9        THE COURT:  No.  Okay.  All right.  Mr. DuPont.
11:11:37  10        MR. DUPONT:  Thank you.  So maybe just for
11   housekeeping, Mr. Juarez has lodged five objections; and I
12   don't really know pragmatically how to adopt them for the
13   purposes of his record the arguments lodged by counsel for
14   Dr. Barson.  But, in essence, they are substantively the
11:12:01  15   same arguments.  It may be easier for me to articulate
16   that than perhaps --
17        THE COURT:  Just briefly.  Just briefly say what
18   it is, and I will remember the arguments that counsel for
19   Dr. Barson made.
11:12:14  20        MR. DUPONT:  So at least I would like to attempt
21   to somehow incorporate those arguments into Mr. Juarez's
22   record.
23        THE COURT:  All right.
24        MR. DUPONT:  The first one, which was an
11:12:24  25   objection to the generalization of the offense conduct.

```
11:12:52
```

 1    Probation had used the reports.  The argument was that for

 2    Mr. Williams and, of course -- from counsel Williams and

 3    on behalf of Mr. Juarez that we objected to the way

 4    probation wrote it versus the way the evidence was

 5    presented.  That would be the first objection.

 6              THE COURT:  You are talking about just general

 7    conduct?

 8              MR. DUPONT:  Correct.

 9              THE COURT:  All right.  I will overrule that one.

10              MR. DUPONT:  The second was -- and the Court has

11    ruled with regard to the six level adjustment for the

12    number of victims.  I believe the Court has ruled on that

13    one.

14              THE COURT:  That's right.  That was overruled,

15    also.  I will overrule your objection.

16              MR. DUPONT:  And so, I think that I'm going to

17    skip one.  The fourth one was with regards to the

18    restitution, and we've heard many of the arguments with

19    regards to that.  So I'll adopt Dr. Barson's argument with

20    regards to the restitution.

21              THE COURT:  I will overrule your objection.

22              MR. DUPONT:  I will leave the arguments lodged

23    there.

24         Which I will back up to role, at least for Mr. Juarez.

25    The presentence report indicated he had an average

1   participation in this conspiracy.  I would like to note

2   just a few things.

3        First, Mr. Balboni argued in the last sentencing

4   hearing a few things of note.  First, that without

11:14:09   5   Dr. Barson's participation they wouldn't have got

6   anywhere.  And I think I quote that.  That's certainly not

7   true for Mr. Juarez.

8        And more offensively, his argument was that Dr. --

9   Mr. Juarez ordered the tests.  There is zero evidence of

11:14:36   10  that contained in an 8-page file that Mr. Juarez ordered

11  tests.  And I'll reflect to the record for that outside of

12  my argument or his assertion of that fact, which

13  Dr. Barson's attorneys disagreed with as well.

14       So with regards to participation I would like to go up

11:14:59   15  to 10,000 feet if I can, theoretically, here in the

16  courtroom and look at what we have.  You have Edgar

17  Shakbazyan that likely is the mastermind and who,

18  interestingly, showed up and pled guilty on the first day

19  in court.  Admirable.  I'm surprised he did show up, in

11:15:18   20  fairness; and he did.

21       You can't do this scheme without a doctor.  We know

22  that, too.  Everybody else in this conspiracy becomes a

23  pawn to Edgar Shakbazyan or any of these people that set

24  these clinics up.  Everybody else is a pawn because you

11:15:40   25  can't do it without a doctor.  We know that.  Short of

1    these folks, these people -- and we know that they found

2    billing codes and other things in California.  I don't

3    even know if you need a doctor.  They could probably steal

4    the doctor's information and still pull this scheme off.

11:16:01    5        So what is this man guilty of?  Honestly?  The defense

6    -- well, the jury spoke.  They convicted him wholesale,

7    just like Dr. Barson.  Respectfully, even today, myself --

8    and not to offend the Court's sensibilities.  We respect

9    their verdict, but we disagree with them.

11:16:24    10       Dr. Juarez was paid $20,000 out of one point -- in

11    essence, $1.9 million.  His take in this conspiracy is one

12    one-hundredths of a percent.  And that -- I mean, that's

13    just plugging in the numbers in a calculator.

14       This is not a man that was peddling drugs or writing

11:16:52    15   prescriptions.  He wasn't armed robbing people.  This man,

16    if anything, stood on trial for practicing medicine while

17    he is a felon.  If we call it even, that's what is up.

18       And so, is there any redeeming qualities to that?  I

19    don't know.  I have thought about what I'm going to say to

11:17:18    20   you for months.  However, the reality is the scheme is, as

21    follows:  The Shakbazyans of the world need doctors that

22    are ignorant or that have trouble early on so they can get

23    them in there to promise them the moon.  All you have to

24    do is watch or view ten percent of the patient files; and

11:17:42    25   we're going to pay you $7,000 or $10,000, whatever it is.

1    That's all it is.  This scheme is over and over, and this

2    courthouse is filled with that.

3        But they also need the front of the house so the

4    doctor feels comfortable continuing while these people are

11:17:57    5    billing ridiculously.  That's where he comes in.  Because

6    they also need people like him because he wants to work

7    and do good by medicine.  But he is not employable because

8    he is a felon, and Shakbazyan knows that because he put --

9    he responded to an ad that's on Craig's list.

11:18:23    10    Did he know about this conspiracy?  The jury believes

11    he did.  But out of 20 witnesses that testified right

12    there as I am sitting in the back way over there, I only

13    cross-examined three people because his name only came up

14    three times out of 20 witnesses.  To me that's important.

11:18:44    15    This scheme did not need his help.  It was not

16    dependent on Dario Juarez.  He is a pawn easily to be

17    replaced.  There were bigger people here.

18        You can see I'm somewhat passionate because this was a

19    big case and involves a lot of moving parts.  And I

11:19:14    20    listened intently to Dr. Barson's sentencing and arguments

21    from counsel and your rulings, and I would ask that you

22    consider his level of involvement not only in terms of

23    participation, because his criminal history is what hurts

24    him here, if we look at it honestly, because it moves him

11:19:41    25    right.  And that's what it is.  There is no argument

1   against his criminal history.

2       But if we look at his role 10,000-foot up do we treat

3   him the same as Dr. Barson?  I would ask you not to.  I

4   have also submitted -- I believe everybody received copies

11:20:09   5   of letters, of character letters.  And there are plenty of

6   people that will speak on his behalf.  The man is a

7   God-fearing man and has demonstrated that while he has

8   been incarcerated.  He has high degrees, and his criminal

9   history is all about trying to practice medicine.  It's

11:20:37   10  weird.  In 16 years I have never seen a defendant like

11  him.  Usually my clients are drug dealers and kill people.

12  That's not the case here.

13      So I would ask you to again vary as requested by

14  previous counsel.  The numbers are the same for him,

11:21:01   15  Judge.  They are the same.  And so that's really all I

16  have got.  I would ask you to consider the 10,000-foot

17  view on him, preserving all the arguments that we have

18  that may need to be litigated in the Fifth Circuit.  We

19  recognize that.  And they are real arguments.  These are

11:21:20   20  important issues.  I believe he might have something --

21  well, I guess you probably --

22          THE COURT:  Let's see what Mr. Balboni has to

23  say.

24          MR. BALBONI:  Thank you, Your Honor.  While

11:21:34   25  Mr. DuPont is correct this scheme would not have been able

11:21:51

1  to go forward without Dr. Barson as we argued earlier;
2  likewise, it couldn't go forward without Mr. Juarez.  It
3  didn't have to be Mr. Juarez.  It could have been
4  Mr. Smith.  But in this case it was Mr. Juarez, and he was
5  the face of the Barson Clinic.  He was the doctor that
6  patients thought they were seeing.  He was the doctor that
7  Amber Wheeler, the medical assistant, thought was the only
8  doctor.  She was the only other or the only certified
9  medical professional in the clinic; and she testified

11:22:15

10  that, as far as she knew, Dario Juarez was a doctor.
11      To keep up the facade, to keep up the scheme, somebody
12  had to play the role of the doctor.  So the patients would
13  come in.  They would be, quote, seen by a doctor.  And
14  part of that is because if there is an unravelling, if

11:22:38

15  Medicare were to come by, there has to be, again, some
16  plausible -- at least in Houston.  I understand in other
17  parts of the country they don't bother.  But in Houston
18  they need to have a plausible, operating medical clinic.
19  And that's what they had in the Barson Clinic; and

11:22:57

20  Mr. Juarez was -- to everybody who went to that clinic, he
21  was the doctor.  So without him the clinic would not be
22  able to function the way it was designed.
23      As Mr. DuPont pointed out, the defendant has an
24  extensive criminal background; and he likes to pretend

11:23:19

25  that he is a doctor.  He has at least two convictions for

1    practicing medicine without a license.  He pled guilty to

2    both of those.  And essentially that's what he was doing

3    for the Barson Clinic.  He was, once again, practicing

4    medicine without a license, pretending to be a doctor all

11:23:37    5    to facilitate this $1.2 or $2.1, depending on how you look

6    at it, million dollar fraud on Medicare.

7         I think given all that, Your Honor, the United States

8    is asking for a sentence midway in the range of a sentence

9    for 145 or, excuse me, 145 months as well as the

11:24:02    10    restitution in the amount we have been discussing and a

11    preliminary order of forfeiture in a similar amount.

12              THE COURT:  Okay.  Mr. Juarez, anything you would

13    like to say before I pronounce sentence?

14              MR. DUPONT:  If I may respond, respectfully.

11:24:21    15              THE COURT:  Yes.  Certainly.

16              MR. DUPONT:  I did miss a few things that I would

17    like to respond to Mr. Balboni.  This is splitting a hair,

18    but he is a doctor.  He has a PhD.  While he is a felon,

19    he is still a doctor.  I'm a doctor.  Mr. Balboni is a

11:24:35    20    doctor.  Now, we don't call ourselves doctors; but we have

21    JDs.

22         So, secondly, I don't want us all to get confused with

23    what arguments were with his role versus what the three

24    people said.  Okay.  So I would like the Court to, if

11:24:59    25    possible, recall upon your recollection of the people that

1    testified about his role because argument believes this

2    man to be running around like a doctor; but only three

3    people even brought his name up.  That's why I never -- I

4    didn't stand up 17 times.  I didn't ask anybody any

11:25:20    5    questions.  I didn't need to.

6        And we all know -- I think it's common understanding

7    amongst people that are in our profession -- you can run a

8    clinic with a PA.  You don't have to have a doctor.  It's

9    -- I go to CVS, and I see a PA.  The doctor is not there.

11:25:43    10    As long as they are in arm's reach, right?  So the

11    perception that they think he is a doctor is not the legal

12    standard.

13        Lastly, I forgot to argue with regards to -- but I

14    suppose the Court when they make -- when she makes her

11:26:00    15    findings that I had objected to, well, role.  So my fifth

16    objection was for the calculation.

17              THE COURT:  All right.

18              MR. DUPONT:  I think that's all I have, Your

19    Honor, hopefully.

11:26:13    20              THE COURT:  All right.  I need to rule on this

21    before I ask Mr. Juarez if he has any comments.  I have to

22    say that the average participant is somebody in my mind

23    that was present, functioning, doing something on many

24    occasions or sometimes only one but usually just a person

11:26:56    25    who is in there doing it on a daily basis; and there is

1    nothing extraordinary that would take that person out of

2    that calculation, either something much more than an

3    active participant, like being the leader or the

4    organizer, or something less, a minimal person.

11:27:27    5        I mean, the receptionist, the medical assistant who

6    was there was not charged with a crime.  She might have

7    been charged with a crime.  Had she been charged with a

8    crime she would be the kind of person who could be a

9    minimal or minor participant, not Mr. Juarez.

11:27:49   10        So I'm going to overrule that objection; and that

11    means that I'm going to overrule your last objection,

12    which is a recalculation of the guidelines.  And I find a

13    total offense level of 28 and a criminal history category

14    of 5, which gives a guideline provision range of 130 to

11:28:11   15    162 months.

16        All right.  Mr. Juarez, anything you would like to say

17    before I pronounce sentence?

18            DEFENDANT JUAREZ:  I would just like to say thank

19    you for hearing my case and also thank you to everyone and

11:28:24   20    I respect the decision that you made but I disagree with

21    it and I thank you very much for hearing me.

22            THE COURT:  All right.  Thank you.  Anything else

23    from anyone before I pronounce sentence?

24            MR. DUPONT:  I don't believe so.

11:28:39   25            MR. BALBONI:  No, Your Honor.

1           THE COURT:  Dario Juarez is before the Court for

2    sentencing after pleading guilty to one count involving

3    conspiracy to commit health care fraud, 19 counts of

4    health care fraud.

11:28:57   5           Mr. Juarez, though not licensed or medically trained,

6    is identified as the physician's assistant.  Juarez saw

7    all of the patients as if he were a doctor and was known

8    as Dr. Dario by some people, including the medical

9    assistant at the clinic.

11:29:14  10           The scheme involved the use of the personal

11   identifying information of at least 429 beneficiaries to

12   submit unauthorized, fraudulent claims for various

13   diagnostics tests which included rectal sensation tests

14   and EMG studies of the anal or urethral sphincter.  These

11:29:34  15   tests were medically unnecessary and were not requested by

16   the beneficiary or were not provided.

17           Mr. Juarez was held accountable for fraudulently

18   billing Medicare approximately $2,152,455.  Medicare paid

19   $1,188,993.82.  Mr. Juarez is deemed an average

11:29:56  20   participant in this scheme to defraud Medicare.

21           The large amount of money fraudulently obtained over

22   the course of two months is significant.  Due to the

23   significant prison range and in conjunction with the

24   factors listed under 18 United States Code Section 3553(a)

11:30:11  25   a sentence at the bottom of the guideline range of

1    130 months is appropriate and would adequately reflect the

2    seriousness of the offense, promote respect for the law,

3    provide deterrence to future criminal conduct and address

4    the defendant's background and characteristics.  And a

11:30:30   5    three-year term of supervised release would be adequate to

6    allow for monitoring and to provide the defendant with the

7    necessary time to address the criminal monetary penalties

8    imposed.

9         And I should backtrack a little bit and say that I

11:30:44   10   adopt the presentence report as my own, both the findings

11   of fact and the application of the guidelines to the facts

12   and find a total offense level of 28 and criminal history

13   category of 5.

14        Based upon the defendant's financial profile and

11:30:58   15   substantial amount of restitution owed it is considered

16   that he does not have the ability to pay a fine within the

17   prescribed guideline range nor does he have the ability to

18   pay a reduced fine.  And, therefore, a fine will be waived

19   in this case.

11:31:16   20        Pursuant to the Sentencing Reform Act of 1984 it is

21   the judgment of the Court that the defendant, Dario

22   Juarez, is hereby committed to the custody of the Bureau

23   of Prisons to be imprisoned for a term of 120 months as to

24   each of Counts 1 through 19 to run concurrently to each

11:31:34   25   other and consecutive to ten months as to Count 20 for a

1   total term of 130 months.

2        Upon release from imprisonment the defendant shall be

3   placed on supervised release for a term of three years.

4   This term consists of three years as to each of Counts 1

11:31:50   5   through 20, all such terms to run concurrently.

6        Within 72 hours of release from the custody of the

7   Bureau of Prisons the defendant shall report in person to

8   the probation office in the district to which the

9   defendant is released.

11:32:00   10        While on supervised release the defendant shall not

11   commit another Federal, State or local crime, shall comply

12   with the standard conditions adopted by this Court under

13   General Order No. H-1996-10, abide by any mandatory

14   conditions required by law and shall comply with the

11:32:17   15   following additional conditions.

16        The defendant shall not possess a firearm, ammunition,

17   destructive device or any other dangerous weapon.  The

18   defendant shall cooperate in the collection of a DNA

19   sample from the defendant if the collection of such a

11:32:29   20   sample is authorized pursuant to Section 3 of the DNA

21   Analysis Backlog Elimination Act of 2000.

22        The defendant is required to provide the probation

23   officer access to any requested financial information.

24   The defendant is prohibited from incurring new credit

11:32:48   25   charges or opening additional lines of credit without

1    approval of the probation officer.  The defendant is

2    prohibited from possessing a credit access device such as

3    a credit card unless first authorized by the probation

4    officer.

11:33:00    5        It is further ordered that the defendant pay

6    restitution in the amount of $1,188,993.82 to Medicare

7    payable to the following address:  CMS Division of

8    Accounting Operations; 7500 Security Boulevard; Mail Stop

9    C3-1-03; Baltimore, Maryland 21244-1850.

11:33:25   10        It is further ordered that the defendant is jointly

11   and severally liable with Dennis B. Barson, Jr., Criminal

12   No. 4:13-CR-367, Defendant 1, and Edgar Shakbazyan,

13   Criminal No. 4:13-CR-367, Defendant 3, to pay restitution

14   in the amount of $1,188,993.82 to Medicare.  The

11:33:49   15   defendant's restitution obligation shall not be affected

16   by any restitution payment that may be paid by other

17   defendants in this case except that no further payment

18   shall be required after the sum of the amounts paid by all

19   defendants has fully covered all compensable losses.

11:34:05   20        It is further ordered that the defendant shall pay to

21   the United States a special assessment of $2,000.  The

22   Court finds that the defendant does not have the ability

23   to pay a fine and will waive the fine in this case.

24        Having assessed the defendant's ability to pay,

11:34:20   25   payment of the total criminal monetary penalties shall be

1   due, as follows:  The defendant shall make a lump sum

2   payment of $2,000 due immediately.  Balance due at

3   50 percent of any wages earned while in prison in

4   accordance with the Bureau of Prisons Inmate Financial

11:34:38   5   Responsibility Program.

6       Any balance remaining after release from imprisonment

7   shall be due in monthly installments of at least 10

8   percent of the defendant's gross income to be charged

9   during supervision, if needed, based on the defendant's

11:34:50   10   changed circumstances or $300 per month, whichever is

11   greater, to commence 30 days after release from

12   imprisonment to a term of supervision.  Payment is to be

13   made to the United States District Clerk, Southern

14   District of Texas.

11:35:01   15       And I will order, also, that the $1,188,993.82 of

16   restitution payable to Medicare is due and owing

17   immediately along with the special assessment.

18       Mr. Juarez, to the extent you have not waived your

19   right to appeal, you have a right to appeal your

11:35:28   20   conviction and your sentence.  If you do not have the

21   funds to pay for an attorney, one will be provided for you

22   at the Government's expense along with any transcripts or

23   other documents necessary for such an appeal.

24       Is there anything else?

11:35:38   25           MR. DUPONT:  Yes, Judge.  I was appointed on the

 1    panel to represent Mr. Juarez.  Of course, we fought long

 2    and hard.  I would ask to withdraw with the idea that I

 3    would like a fresh set of eyes to review this case.  One

 4    perhaps that does appeals for the CJ panel.

11:35:59    5          THE COURT:  All right.  I will grant your motion.

 6    I want you to be sure that I will send this down to the

 7    duty magistrate to appoint Mr. Juarez a new attorney for

 8    the appeal.  I want you to keep an eye on this case until

 9    that is done.

11:36:14   10          MR. DUPONT:  Okay.

11          THE COURT:  So we don't fall through the cracks

12    on this.

13          MR. DUPONT:  Okay.

14          THE COURT:  Yes.

11:36:19   15          MR. BALBONI:  Yes, Your Honor.  I know the Court

16    is going to address this after we finish the three

17    sentencings.  Again, the United States requests when that

18    is done that an order of forfeiture be made.  Well,

19    actually, Your Honor, I don't know that you have ordered

11:36:32   20    forfeiture in this case.  You did restitution, and you did

21    special assessment.  But the United States has filed an

22    order of forfeiture, also, with respect to Mr. Juarez.

23          THE COURT:  Okay.

24          MR. DUPONT:  Is that --

11:36:53   25          THE COURT:  Well, I don't have the order with me

1    up here.  I don't know why, but I don't.

2         MR. BALBONI:  I may be able to get one, Your

3    Honor.

4         THE COURT:  All right.

11:37:03    5         MR. DUPONT:  We didn't participate in the

6    last-minute legal wranglings with regard to this, Your

7    Honor.  I'm happy to stick around and participate, if need

8    be.

9         THE COURT:  To participate in the -- your

11:37:19   10    objections to -- to participate in a hearing on the order

11    imposing --

12         MR. DUPONT:  I have not filed any pleadings in

13    that regard.  I think that was more so with Mr. Shakbazyan

14    and Dr. Barson.

11:37:35   15         THE COURT:  Well, I have got -- thank you.

16    Ms. Hawkins has handed me the preliminary order of

17    forfeiture that's been filed for all three defendants, and

18    it was just one order.

19         MS. ROLLINSON:  I believe there are three

11:37:51   20    separate orders.  One motion and an order for each

21    defendant.

22         THE COURT:  Okay.  Well, all right.  Whatever.  I

23    think that --

24         MS. ROLLINSON:  Yes, ma'am.

11:37:57   25         THE COURT:  I think they are pretty much

 1    identical.

 2              MR. BALBONI:  They are, Your Honor.

 3              THE COURT:  There is also an order that

 4    Mr. Balboni handed me imposing personal monetary judgment

 11:38:09   5    against Mr. Juarez.

 6              MR. BALBONI:  Yes, Your Honor.  I'm sorry.  The

 7    order of forfeiture includes a personal money judgment.

 8    Yes, Your Honor.

 9              THE COURT:  Okay.  All right.  So there would

 11:38:24  10    just be one of those?

 11              MR. BALBONI:  Yes, Your Honor.

 12              THE COURT:  All right.  Okay.  All right.  Please

 13    stick around and make any objections that you may have to

 14    the order of forfeiture.

 11:38:34  15              MR. DUPONT:  Yes, Your Honor.

 16              THE COURT:  You all may have a seat.

 17         (Recess from 11:38 to 12:00.)

 18              THE COURT:  Please be seated, ladies and

 19    gentlemen.  I understand Mr. DuPont has some more he wants

 12:00:17  20    to put on the record.  We'll take you up next.  Well,

 21    let's do it now.

 22              MR. DUPONT:  My apologies.

 23              THE COURT:  That's all right.

 24              MR. DUPONT:  Just two things.  I've noticed the

 12:00:29  25    Government, in fact.  I would ask for placement with

Vol 1 - 64

regards to a facility for Mr. Juarez.  I understand he has
family members from the valley.  They were present in the
courtroom.  I think Three Rivers or something in San
Antonio would be the request to include in the order.

12:00:48          THE COURT:  I will make that recommendation to
the Bureau of Prisons, but you understand they don't have
to follow my recommendation?

          MR. DUPONT:  Yes.

          THE COURT:  Three Rivers or San Antonio, close to
12:00:56   San Antonio?

          MR. DUPONT:  Yes, Your Honor.

          THE COURT:  Okay.

          MR. DUPONT:  Then just, for the record, my
objection to the reasonableness of sentence.

12:01:03          THE COURT:  Your objection is overruled.

          MR. DUPONT:  Thank you, Your Honor.

          THE COURT:  All right.  Thank you.

     The next case is United States vs. Edgar Shakbazyan,
No. H:13-367, Defendant No. 3.

12:01:10          MR. GERAGOS:  Good morning, Your Honor.  Mark
Geragos, G-e-r-a-g-o-s, appearing and present with
Mr. Shakbazyan.

          THE COURT:  Good morning.  Actually, I think it's
just now afternoon.

12:01:25          MR. GERAGOS:  It's still morning in LA where I

1    came from.

2              THE COURT:  That's right.

3              MR. BALBONI:  Al Balboni for the United States,

4    Your Honor.

12:01:31    5              THE COURT:  Good afternoon.

6              MS. FRAZIOR:  Adrienne Frazior for the United

7    States.

8              THE COURT:  Good afternoon.  And you are Edward

9    Shakbazyan?

12:01:38   10              DEFENDANT SHAKBAZYAN:  Yes, Your Honor.

11              THE COURT:  In a previous proceeding you were

12    found guilty of Count 1, conspiracy to commit health care

13    fraud in violation of 18 United States Code Section 1349

14    and Counts 2 through 20, health care fraud in violation of

12:01:52   15    18 United States Code Sections 1347 and 2.

16        Mr. Shakbazyan, have you had a chance to read over the

17    presentence report that was filed in your case?

18              DEFENDANT SHAKBAZYAN:  Yes, Your Honor.

19              THE COURT:  And have you discussed it with your

12:02:07   20    attorney, Mr. Gurovich?

21              MR. GERAGOS:  No.  With myself.  I substituted in

22    for Mr. Gurovich.

23              THE COURT:  That's right.  I am running a little

24    behind the time here.  Mr. Geragos.

12:02:16   25              MR. GERAGOS:  Thank you.

1          THE COURT:  Mr. Geragos.  Have you discussed the

2     presentence report with Mr. Geragos, your attorney?

3          DEFENDANT SHAKBAZYAN:  Yes, Your Honor.

4          THE COURT:  Do you feel you understand what is

5     contained in the report?

6          DEFENDANT SHAKBAZYAN:  Yes, Your Honor.

7          THE COURT:  Do you have any questions you would

8     like to ask about it at this time?

9          DEFENDANT SHAKBAZYAN:  No, ma'am.

10         THE COURT:  All right.  Did you file any -- would

11    you like to make any objections to the presentence report

12    that were not made on your behalf by your attorney?

13         DEFENDANT SHAKBAZYAN:  No, Your Honor.

14         THE COURT:  All right.

15         MR. GERAGOS:  From a housekeeping standpoint, why

16    don't we -- since there have been two hearings before, why

17    don't I incorporate all of the arguments except where they

18    were derogatory to Mr. Shakbazyan in terms of leadership

19    or anything else and incorporate objections.  But I do

20    want to augment, if I could, in several areas.  I don't

21    want to belabor all of them.

22         THE COURT:  Okay.  All right.

23         MR. GERAGOS:  Obviously, you have ruled.  I don't

24    think my oratory is so great that I'm going to change your

25    mind on some of those.  Maybe on one or two you and I

1    could come to some agreement.

2        THE COURT:  Well, you never know.

3        MR. GERAGOS:  You never know.  Right.  The first

4    would be on the three levels for acceptance.  Of the three

5    defendants standing before you today, he is the only one

6    who pled; and I understand from Mr. Balboni that that was,

7    I believe, on the day set for trial.  When I looked at the

8    transcript it seems to support that.

9        My understanding from Mr. Gurovich, though, is that he

10   had notified Mr. Balboni before that, prior to that; and

11   that they didn't set a change of plea hearing.  They just

12   came in and did it on the day of trial.  Maybe that was as

13   an accommodation by Mr. Balboni for private counsel who

14   was out of town.

15       Then, I noticed in the objections the Government

16   objected to the paragraph having to do with the three

17   levels saying that he should only get two levels.  The

18   thing that was perplexing to me is when I went back and

19   reviewed the paperwork, the original PSR, Paragraph 38,

20   has this quote in it that says, "According to counsel for

21   the Government a motion will be made with the Court at the

22   time of sentencing stating the defendant assisted

23   authorities in the investigation and prosecution of his

24   misconduct by timely notifying authorities of his

25   intention to enter a plea of guilty thereby permitting the

1    Government to avoid preparing for trial and permitting the

2    Government and Court to allocate their resources

3    efficiently."

4         That paragraph is not addressed by the addendum to the

5    presentence report.  Instead, if you see the objections by

6    the Government, the Government objects to Paragraph 49 and

7    says "will not be filing a motion for the third point."

8         I mean, those two seem inconsistent to me.  I would

9    submit to the Court that in reviewing -- and, obviously,

10   Mr. Balboni's recollection is going to be better because I

11   wasn't here.  But I reviewed what looked to me to be the

12   Government's exhibit list in this case that was filed with

13   the Court.  I didn't see anything in the exhibits that

14   looked like it pertains specifically to Mr. Shakbazyan.

15        So I would ask the Court humbly, of course, to give

16   him the third as having been represented in the PSR the

17   first time around before the addendum came out and

18   Paragraph 38 not having been objected to by the

19   Government.  That would be the first area there, and I can

20   do that all at once or if you want to go back and forth

21   and let the Government respond individually.

22        THE COURT:  Well, I think we better let

23   Mr. Balboni respond.  He looks like he is anxious to do

24   so.

25        MR. GERAGOS:  He does look a little anxious.

1            MR. BALBONI:  Yes, Your Honor.  I stay in a

2       constant state of anxiousness.

3            MR. GERAGOS:  I like to say anxiety.

4            MR. BALBONI:  Or anxiety, too.  I have no

12:06:24   5   explanation as to why it was represented in the PSR

6       originally that I had indicated that we were going to file

7       a motion for the third point.  As the Court recalls, the

8       defendant pled the morning of trial.  I believe that

9       Mr. Gurovich and I reached an agreement, if you want to

12:06:42  10   call it that, that he was going to plead straight up to

11       the indictment.  I think it was Wednesday or Thursday of

12       the week prior to trial.

13            Whether it's that point or the day of trial, it wasn't

14       in such a way that it saved us any time whatsoever in

12:06:59  15   preparing.  We had to prepare as though we were going to

16       trial, including Mr. Shakbazyan, until the morning when,

17       as the Court recalls, we had a very lengthy plea colloquy

18       before we finally did reach a meeting of the minds.

19            And so, the United States is not filing the motion for

12:07:17  20   the third level reduction.

21            PROBATION OFFICER:  Your Honor.

22            THE COURT:  Yes.

23            PROBATION OFFICER:  Just to clarify, that

24       paragraph is actually canned wording that goes into all of

12:07:27  25   our PSRs in which the defendants plead guilty and we have

1    not received indication that they were not -- they were

2    going to withhold the third point.

3         So that is our mistake.  We should not have included

4    that.  Typically, in most cases, it is -- I guess it's

12:07:47    5    just that's the way we do it.  So it was not meant to say

6    that we had.  It was just because most cases where the

7    defendant pleas and the offense level is higher than 16

8    the third point is given, but in this case it's not.  So

9    that was probation's mistake.

12:08:05   10              THE COURT:  Okay.

11              MR. GERAGOS:  The problem with that is is that if

12    he relies on it in coming here on the day of sentencing

13    and it is the norm to get the third point over a 16, if I

14    am correct, I have never seen it not happen, I don't

12:08:26   15    understand why the whether it happened prior or during

16    trial why he doesn't get the three points.

17         I mean, he pled.  They didn't have to have the third

18    person here.  In fact, I was joking when we were off the

19    record I can't imagine why this thing took eight days to

12:08:39   20    try in the first place.  Can you imagine if there was a

21    third defendant here how long this would have taken if you

22    would have added in the cross-examination, the kind of

23    pointing of fingers as we have already started to see this

24    morning and we weren't even there?

12:08:52   25         It's almost as if Mr. Shakbazyan -- I mean, there is a

1    certain irony here.  He did not participate in the trial.

2    He saved the Government that, having to do that.  He

3    entered a plea, which I'll get to in a second, fully

4    expecting to get the three levels.  Obviously, probation

5    fully expected he would get the -- or pretrial expected he

6    would get the three levels.  And then to come in, you

7    know, on the day of sentencing and say, well, there was no

8    objection to that particular paragraph but to a later

9    paragraph in there.  And then to say, "Whoops.  We're

10   sorry."  I think that that is unfair to some degree.

11        He clearly did not put the Government through the

12   extra hassle that I can assure you if I had been here to

13   try the case this would not have been eight days.  It

14   might have been longer just because I would have had to

15   have done something, and he would have had to have done

16   something.  And so, I can't imagine that that doesn't help

17   the Government or assist the Government.  So that's why I

18   take issue with it.

19             THE COURT:  I think Mr. Balboni's point is not

20   that it shortened the trial, which obviously it would have

21   or did, but that he had to prepare to prosecute

22   Mr. Shakbazyan for however many days it took him to

23   prepare and get all his ducks in a row and things of that

24   kind and that that is what that extra point is for.  The

25   extra point is for a timely plea of guilty which gives the

1    Government more time for other cases.  I think that's why

2    it was not done.

3        I realize that that is kind of confusing, but I think

4    that the objection that Mr. Balboni made to 49 should have

12:10:45    5    put you on notice that there was going to be some dispute

6    about this.

7            MR. GERAGOS:  Well, clearly it did.  I'm not

8    saying it didn't.

9            THE COURT:  Right.  Right.  I mean, it's not like

12:10:54    10    the day of sentencing --

11            MR. GERAGOS:  I was struck and said I had no

12    knowledge.  It was just inexplicable to me why 38 was in

13    there, and I now have an understanding about it.  I still

14    don't think -- the purpose of that, according to the

12:11:12    15    sentencing guidelines in the third level, is so that you

16    do have more time for other cases and to assist.

17        Clearly they did have more time for other cases.

18    Instead of eight days it could have been 12 days or could

19    have been 10 days, whatever it would have been with a

12:11:24    20    third defendant there.  So they do get the benefit of him

21    pleading.  He does accept responsibility, and it was not

22    on -- I mean, he literally did it on the day of trail.

23    But I take Mr. Balboni at his word that they had some kind

24    of an agreement before it happened, whether it was five or

12:11:41    25    six days beforehand.

1    That gives them enough time to not have to address

2  Mr. Shakbazyan's culpability in an opening statement, for

3  instance, to not have to deal with the closing and not

4  have to deal with other witnesses.  And as I said, the

5  trial exhibit list looks to me to be kind of barren from

6  the idea of having anything specifically that pointed at

7  him.

8    So I would say given all of those factors that this

9  third point to me just seems to be appropriate in this

10  case, and I'm not suggesting that probation did anything

11  nefarious or Mr. Balboni did or anything else.  I just

12  think that given the facts as we know them that the third

13  point for something that's calculated in the 20s would

14  seem to be appropriate.

15    MR. BALBONI:  The language is fairly clear, Your

16  Honor.  If it's 16 or greater and upon motion of the

17  Government stating that the defendant has assisted

18  authorities in the investigation or prosecution of his own

19  misconduct -- that did not happen -- by timely notifying

20  authorities of his intention to enter a plea of guilty

21  thereby permitting the Government to avoid preparing for

22  trial and permitting the Government and the Court to

23  allocate their resources efficiently, you decrease the

24  offense level by one.

25    There was none of that.  There was no -- he didn't

```
 1    assist us with respect to anybody else, and he did not

 2    assist us with respect to any investigation or prosecution

 3    of his own misconduct timely.

 4         MR. GERAGOS:  Except he did allocate the

 5    resources.  That's the third prong that's always the case

 6    as you are allocating -- you are assisting by allocating

 7    the judicial resources and assuring that in a -- from a

 8    two-defendant trial that took eight days, a

 9    three-defendant trial would have taken ten.  That's two

10    full court days.  Just opening and closing and

11    cross-examination alone at a very rudimentary level

12    assisted both the prosecution and the Court.

13         THE COURT:  I understand your point, but I think

14    that the note is pretty clear that they are talking about

15    pretrial preparation as well as shortening the trial.  So

16    I'm going to overrule your objection.

17         MR. GERAGOS:  Okay.  The second area that I

18    wanted to talk about was the idea of leader organizer, and

19    Mr. Balboni mentioned that there was quite a colloquy at

20    the time of the entry of the plea.  And I have got the

21    transcript from October 27th of 2014, and on Page 31 -- do

22    you have it?  Okay.

23         Mr. Balboni says, "Your Honor, the evidence will be

24    that Mr. Shakbazyan was the boss.  He was the manager.  He

25    hired Dr. Barson..." blah, blah, blah.  And then the
```

position is he was well aware of the entire scheme.  So he
is responsible.  If not responsible -- this is going to
Page 32, Lines 10 through 15.  "If not responsible, he has
got to admit he is criminally liable for all those counts.
And what I heard is there is no question that four, all of
which there were claims."  And then, they keep going with
the colloquy.

        Here Mr. Balboni, who is a very experienced and able
prosecutor, both by reputation and by appearing in front
of Your Honor, used the term "manager" himself.  Manager
has a distinct legal meaning.  There is a -- as the Court
knows, leader organizer is at a 4 level.  Under the
sentencing guideline manager is a 3 level.  So it's a
another one level swing as well.

        And the factual basis, which was somewhat, I will
charitably call it, tortured going back and forth finally
was -- and it was at Mr. Balboni's urging that he didn't
think it was good enough to begin with and that he wanted
more.  And they finally got to the meeting of minds, at
least of Mr. Balboni and Mr. Gurovich, that it was
criminally liable.

        That I don't think takes him to leader organizer, and
the fact that Mr. Balboni used the term "manager" I think
binds him in that respect.  He should not be arguing now
for a leader organizer at an additional level.  I would

1  concede, if you will, instead of the 4 level it should be

2  the 3 level for manager.

3          THE COURT:  Mr. Balboni.

4          MR. BALBONI:  Yes, Your Honor.  I used the term

12:16:16  5  "manager" because that is factually what he was referred

6  to.  He was the manager of the clinic.  In no way was that

7  an argument, as we were doing a factual basis, that he in

8  fact was a manager level three points versus an organizer

9  leader four points.

12:16:36  10      In fact, the factual basis as well as the testimony

11  during the trial indicates clearly that Mr. Shakbazyan was

12  the moving force behind this entire scam.  He is the one

13  who hired Dr. Barson and agreed with him to what he was

14  going to be paid.

12:16:55  15      He is the one who instructed Dr. Barson to open the

16  Medicare, get a Medicare provider number to open the bank

17  account.  He told Dr. Barson to basically turn over his --

18  the bank records -- I'm sorry, not the bank records but

19  the checkbook to him.  He had Dr. Barson sign blank checks

12:17:15  20  to be used for Mr. Shakbazyan's purposes.

21      He hired Dario Juarez as the face of the clinic.

22  There is apparently some dispute as to whether he was

23  hired as a physician's assistant or a doctor; and

24  factually, he was neither.  He was the person who ran the

12:17:37  25  clinic on a daily basis.  He was the person who paid the

marketers to bring the patients to the clinic.

He was the person who -- this is circumstantial but the fact that Dr. Barson gave to Mr. Shakbazyan either blank checks signed by him or checks made payable to Care Manage, Inc., that those checks found their way to be deposited into the Care Manage, Inc., account.  So I think it's reasonable to conclude that Mr. Shakbazyan was the conduit for that.  So he was instrumental in moving the money from Dr. Barson's account to the Care Manage account.

Ultimately, that money -- let me go back a second. Mr. Geragos indicates in the exhibit list there doesn't seem to be a lot pertaining to Mr. Shakbazyan, and he is correct because Mr. Shakbazyan was clever enough to keep his name off of almost everything.  And so that's why there are not a lot of records that point to Mr. Shakbazyan.  But nonetheless, the money, a million dollars of it or so, moved from Dr. Barson's account through to this Care Manage account facilitated by Mr. Shakbazyan.  Ultimately, four hundred and -- somewhere around $450,000 of the ill-gotten gain from the Medicare scam went to purchase the property on Nolan Avenue in California, and it's -- that property is de facto owned by Mr. Shakbazyan.

So all that taken together, Your Honor, points to a

1       person who is at the top of the pyramid -- at least the

2       pyramid as we have it here in Houston, Texas.  Is there

3       somebody else that's further away that may have some kind

4       of a role in this?  We don't know.  But the case that's

12:19:37  5   before Your Honor, with respect to the three defendants

6       here at trial, Mr. Shakbazyan is without question the

7       organizer and the leader in this enterprise.

8               MR. GERAGOS:  This is the irony of this.  He

9       pleads to the sheet, basically, is what we call it.  He

12:19:54  10  pleads open to the entire indictment.  It goes through a

11      colloquy.  The Government does not have to put him on

12      trial.  Yet the Government now wants to invoke what

13      happened at the trial to not only deprive him of one of

14      the points on early acceptance but in absentia use facts

12:20:13  15  which were developed at trial when he had no

16      representation in order to create him as this mover and

17      shaker of the -- I can assure you that if he had had

18      representation at trial that that would not have been the

19      case.

12:20:30  20      That we -- when Mr. Balboni says circumstantially this

21      goes to there, well, that's when he wasn't represented.

22      If he had been represented in trial there would have been

23      some explanations for what had happened here.  The

24      unrefuted or unrebutted facts are he literally was not

12:20:46  25  even at that clinic, was out of the country for a period

1    of time and was in LA before August even ended.

2         So there is a real fundamental unfairness with the

3    idea of saying, okay, we're not going to give you a plea.

4    You are going to have to plead open to the Court, which is

12:21:04    5    what he did, that would -- so you can get any kind of

6    acceptance.

7         Now we're going to deprive you of one of the points of

8    acceptance.  And now we're going to use the other two

9    defendants who, obviously, anybody who has been in the

12:21:19    10    criminal justice system knows they are going to make him

11    the bad guy in this case at the trial; and we're going to

12    use that evidence against him at the sentencing and punish

13    him, basically, for entering a plea.

14         You know, to follow along with this, he loses a couple

12:21:32    15    of more points or levels.  He was better off going to

16    trial and taking up more time and putting the Government

17    to the test.

18         So to my mind it stands on its head what the

19    sentencing guidelines were trying to accomplish, which was

12:21:49    20    to encourage pleas, to encourage plea bargains, although

21    that's not the case anymore, but to encourage the idea of

22    resolving these cases.

23         And so all I would do is go back to the transcript

24    where repeatedly Mr. Balboni says, okay, so if not

12:22:07    25    responsible he has got to admit he is criminally liable.

1    Well, that's what he did.  He admitted he was criminally

2    liable.  We did not litigate whether he was a leader or

3    organizer.  We -- he at the time accepted a very

4    accomplished trial attorney's characterization of him as a

5    manager, and words count.  You know, we know the

6    difference between what a manager is and an organizer

7    leader and words count and sometimes you have got to be

8    hoisted on your own petard with words.

9         THE COURT:  Well, yeah.  But, I mean, I don't

10   recall what exactly Mr. Balboni represented as the facts

11   that Mr. Balboni said he could prove at the trial, which

12   is why I always ask that question; and they always can

13   tell me what they think they can prove.

14        And I am very confident that he has basically laid out

15   what he is arguing today, that Mr. Shakbazyan, you know,

16   hired the doctor, set up the whole thing, hired Mr. Juarez

17   and, you know, sat back and waited for the proceeds.  And

18   to me that's -- that's an organizer at the very least.

19        MR. GERAGOS:  Well, except that he did on Page

20   31, Line 25 say he was the manager --

21        THE COURT:  He said he was the boss --

22        MR. GERAGOS:  Yeah.  He hired --

23        THE COURT:  -- and he was the manager.  And

24   that's the role he played.  He was managing that clinic.

25   But that -- but he also was the organizer of the clinic.

1    He founded the clinic.

2            MR. GERAGOS:  We're not alleging that any more

3    than Dr. Barson did that Mr. Shakbazyan sat down at the

4    computer terminal, entered the false billing.  That's not

12:23:57  5    the position.

6        The position is he was well aware of the entire

7    scheme, which included the types of billing that we're

8    going to be doing, because that was his job.  That's why

9    he was sent there to set the clinic up.  So he is

12:24:09  10   responsible.  If not responsible, he has got to admit that

11   he is criminally liable.  Blah, blah.  And that is -- that

12   is the colloquy.  That was after --

13           THE COURT:  We don't sentence people by what they

14   admit they did.

12:24:26  15           MR. GERAGOS:  Well, we do have to --

16           THE COURT:  We sentence people by what the

17   factual basis is.

18           MR. GERAGOS:  The basis.  I agree.

19           THE COURT:  The factual basis was established at

12:24:35  20   the plea colloquy and at the trial.  I mean, the evidence

21   was at the trial.

22           MR. GERAGOS:  Right.  But the trial can't in --

23   you can't gin it up for him in absentia at a trial he

24   wasn't represented at.

12:24:50  25           THE COURT:  Well, I don't think that's the way it

1    works.  I doubt very seriously that the Fifth Circuit

2    would agree with you on that because we can take into

3    account all kinds of factual things, and it is

4    preponderance of the evidence.  It's not beyond a

12:25:06   5    reasonable doubt, which is what the jury found.  So, I

6    mean, it's like it gets pretty loosened up by the time you

7    get to the sentencing phase.

8         And what appears on the record as the facts of the

9    case are just the facts of the case.  And you can't

12:25:22  10    because Mr. Balboni misused a word or a slip of the tongue

11    or was not being precise enough, I can't just ignore that.

12    I have to look at the whole picture.

13              MR. GERAGOS:  Right.  I understand.

14              THE COURT:  The 10,000 miles up.

12:25:40  15              MR. GERAGOS:  I like to see the 30,000-foot view.

16    I don't know.  Mr. DuPont flies at 10,000.  I feel a lot

17    safer at 30,000 feet.

18         The problem is, though, it comes back to the first

19    argument.  I understand that you can use, you know, a wide

12:25:57  20    expanse of items; but the problem is where -- what is the

21    point?  At a certain point we undercut the very rule for

22    pleading.

23              THE COURT:  Well, I'll tell you I was very

24    disappointed when he pled.  I wanted to see -- I wanted to

12:26:17  25    see the trial.  I was very disappointed that he pled.  So,

                    1   to me, a plea there are lots of reasons for pleading
                    2   guilty.  One of them is you get a better deal.  But under
                    3   the sentencing guidelines and the structure of that whole
                    4   thing, it's not to encourage -- the number one thing is
12:26:38            5   not to encourage pleas, obviously, because you don't get
                    6   the kind of plea you get in State Court.  There is a whole
                    7   lot more put on a Federal defendant than on a State
                    8   defendant.  You know, I just don't accept that I'm
                    9   supposed to jump over all these things because he entered
12:26:56           10   a plea of guilty.
                   11        MR. GERAGOS:  Well, it's not so much you have got
                   12   to jump.  If the suggestion is that you have got to
                   13   ignore, I don't want to misspeak or suggest that.  But
                   14   it's that if you are going to be -- maybe I'm disappointed
12:27:12           15   as well he didn't go to trial.  I would have liked to have
                   16   tried this case.
                   17        The problem is, though, that he is being penalized for
                   18   entering the plea; and that's -- I'm not asking you to
                   19   ignore anything.  But there is a penalty to that because
12:27:27           20   all you heard was facts developed before you that had no
                   21   input from him.  The legal concepts of whether it's res
                   22   judicata or collateral estoppel would fail in this case
                   23   because you couldn't bind him on a civil level.  If we
                   24   were in a civil case you could not argue that he was bound
12:27:49           25   under res judicata or collateral estoppel.

1    So it would seem to me to be somewhat of a problem in

2  a criminal sentencing case to say we're going to bind him

3  under the same principle of res judicata or collateral

4  estoppel in a criminal sentencing when he pled or he

12:28:07  5  wasn't represented in the criminal trial.  That's the

6  conundrum.

7    I understand your position.  You sat here for eight

8  days.  You heard the evidence.  You obviously have a view

9  of this case.

12:28:16  10    THE COURT:  And I read the indictment.

11    MR. GERAGOS:  Correct.

12    THE COURT:  And I also participated in the plea

13  -- in Mr. Shakbazyan's plea and heard Mr. Balboni tell me

14  what he thought he could prove against Mr. Shakbazyan.  I

12:28:30  15  mean, all of that is pretty consistent.

16    MR. GERAGOS:  Well, I would say that the plea and

17  the factual basis are more consistent with what I am

18  arguing than what Mr. Balboni is; and I read it.  I didn't

19  sit here for the eight days of the trial.  So I have got

12:28:48  20  pieces of witnesses and transcripts that I have looked at.

21    But I come back to the same problem.  It shouldn't

22  be -- he shouldn't be penalized for a standard that's

23  being imposed where the facts developed at a trial where

24  he wasn't represented are going to be used against him

12:29:04  25  because I don't think that, oh, a lot of the facts I have

1    heard this morning are anywhere near where they would have

2    been if he had had representation or if he had

3    participated in the trial.  I guess that's my point.

4            THE COURT:  All right.  You make a good point,

12:29:18   5    but I don't buy it.

6            MR. GERAGOS:  Okay.

7            THE COURT:  I'm going to overrule your objection.

8            MR. GERAGOS:  Then I would like to augment,

9    also -- I put it in the paperwork.  I haven't heard

12:29:28  10    anybody argue it orally -- the number of victims.  Also,

11    he pled to the indictment.  The number of victims is less

12    than ten in the indictment, with Medicare being counted as

13    one and talking about the -- under the theory of the

14    unindicted co-conspirators.  Under the victim enhancement

12:29:45  15    you do not get the others.

16        All he pled to is only factual basis.  There is

17    nothing that gets them to the victim enhancement.  I

18    understand they want to use things that were developed at

19    a trial that, once again, I wasn't at the trial.  He pled

12:29:59  20    to the indictment.  The indictment only lists eight.

21    Their benchmark, so to speak, that they have got to hop

22    over is 10.  And so I would ask that the Court also

23    overrule that in the victim enhancement as well.

24            THE COURT:  Mr. Balboni.

12:30:17  25            MR. BALBONI:  Yes, Your Honor.  He pled guilty to

1    the indictment.  The indictment charged that all of it was
2    fraud.  The indictment charged that 429 beneficiaries were
3    seen.  $2.1 million was billed.  $1.182 was paid.  It was
4    all fraud either because it was not provided or because it
5    was not reasonably -- or was not medically necessary.

6        And so the victims, if we want to limit the Court,
7    which I don't believe is true or is right, but if you want
8    to limit it just to the record then the record supports
9    that Mr. Shakbazyan in his plea colloquy agreed to the
10    indictment.  And, therefore, he has agreed to the fact
11    that there were 429 victims.

12        MR. GERAGOS:  Well, if that's how it is
13    calculated, that's the problem.  The indictment
14    specifically on Page 5, Subsection 16, says, "Defendants
15    Barson and Juarez would and did cause Medicare to be
16    billed for procedures involving 429 patients over 39 days
17    over a two-month period."

18        Then the subsequent portion of the indictment -- and
19    this is yet another problem that I found with some of the
20    arguments that I heard this morning.  The Counts 2 through
21    20 specifically say, "Beginning in or about 2009."  And
22    that's at Page 7, Subsection 2, under Counts 2 through 20.
23    And says under sub (d), health care fraud, "Beginning in
24    or about June 2009 and continuing thereafter to in or
25    about August 2009."

```
12:32:26
```

1    So as far as everything goes -- and this leads into

2    the one other objection I wanted to make.  As far as

3    everything goes in terms of utilizing the November

4    application, November 1st, 2009, Counts 2 through 20 and

5    21 are on their face of the indictment limited to the

6    August 2009 date.  So there is clearly ex post facto.  The

7    problem that they have is the way the indictment is

8    drafted up is they have got on the first count of the

9    conspiracy they have that February date of 2010, which

10   applies to Count 1, the object of the conspiracy, the

11   manner and the means; and they specifically have 2010.

12   But for Counts 2 through 20 it's only through August 2009.

13   Clearly for Counts 2 through 20 those are ex post facto.

14       So we have got that additional problem that they are

15   at odds with one another and that they can't apply the

16   November 1st -- because it obviously didn't go into effect

17   until then -- the November 1st, 2009 sentencing guideline

18   because that would clearly be ex post facto as well.

19            MR. BALBONI:  But we have the conspiracy count,

20   Your Honor, which covers all of the conduct and it starts

21   and it ends -- I'm sorry.  It starts in 2009 and ends

22   February of 2010, which is the argument earlier.

23   Therefore, under the guidelines, we are -- the Court is in

24   the proper guideline 2009.  The Court is to use one

25   guideline only.  In this case it's 2009.  It would be ex

1    post facto as it relates to Counts 2 through 20, as

2    Mr. Geragos points out; but as to Count 1 it, in fact, is

3    not ex post facto.  And so the calculation would not

4    change.

12:34:08    5          MR. GERAGOS:  That's the problem.  The object of

6    the -- it's a conspiracy to commit 18 U.S.C. 1349.  That's

7    what the Count 1 is.

8          The actual substantive offenses are 18 U.S.C. 1347,

9    Counts 2 through 20.  You cannot allege that the health

12:34:30    10   care fraud took place, which they do and which the grand

11   jury found, from June of 2009 to August of 2009 and in

12   addition in your Count 1 where you have got the conspiracy

13   say that it took place over 39 days, which perfectly gels

14   with what the substantive counts are, and then say, well,

12:34:54    15   even though we have got a conspiracy -- we have got the

16   actual substantive counts, which are barred and I believe

17   I hear him correctly agreeing with me, Mr. Balboni

18   agreeing with me, you are barred from using the November

19   2009 sentencing guidelines for Counts 2 through 20.  Their

12:35:12    20   argument is because of Count 1 having the February date

21   that you can use it, but you can't unless you are just

22   using it as to Count 1.

23          I would suggest -- and I have looked all over for

24   this.  I have never seen a split indictment like this

12:35:27    25   where the conspiracy covers a different period of time

than the actual substantive offenses.  But in any event,
clearly you can't use the November 1st, 2009 for anything
that happens on Counts 2 through 20.  If that's the case,
then you can't -- it may -- I guess it begs logical sense.

How could you ever parse what you are using for Counts
2 to 20 versus what you are using for Count 1 if they are
asking you for somebody who pled open in the case, who did
not go to trial, they are asking you now to kind of
bootstrap Count 1 into Counts 2 through 20.  I just don't
think you can do that.

That would be the -- I guess the most analogous form
would be if somebody committed different offenses over a
period of time, Counts 1 through 20, some barred by the
statute of limitations and they say, "Well, here is a
conspiracy count.  We're going to revive the substantive
counts that have already been barred by the statute."  You
can't do that.  So why would you be able to do it in an ex
post facto way here?

Because if you could do that, then there would never
be any problem with ex post facto.  All you would have to
do is just allege the conspiracy that leap frogs the
statute of limitations take.

And so, based on that I would ask the Court to use the
appropriate guideline for the one the Government conceded
is appropriate to Counts 2 through 20, which are the

1    lion's share if not 95 percent of the counts that my

2    client pled to.

3            MR. BALBONI:  Your Honor, again, the -- first of

4    all, I think it's important to note if what Mr. Geragos

12:37:10   5    says we skipped over, we hopped over the magic line, if we

6    just had a charge of conspiracy and didn't prove anything

7    post November 1st of 2009; but in this case we had at

8    least one payment directly from -- I believe it was Care

9    Manage?

12:37:24   10           MS. FRAZIOR:  Uh-huh.

11           MR. BALBONI:  To Dr. Barson supposedly allegedly

12    for payment of taxes related to the W-2 or the 1099 he

13    received that laid out for or accounted for all of the

14    Medicare money that had been -- they thought Medicare

12:37:49   15   thought had been paid to Dr. Barson.  He was in contact

16    with Mr. Shakbazyan.  And then, it was because of that

17    that the conspiracy extended to February of 2010 because

18    it was still ongoing at that point in time.

19           And so, I don't think Mr. Geragos' argument takes into

12:38:12   20   account that factor that, in fact, it is not just a date

21    that was picked in the future.  It was actually the last

22    time, the end, if you will, of the conspiracy, which was

23    the payment of that somewhere around $10,000 to

24    Dr. Barson.

12:38:28   25           MR. GERAGOS:  Right.  But the problem is that you

1  have got, by my calculation, 19 counts of the 20-count

2  indictment, substantive counts, which say -- specifically

3  say that beginning in or about June 20th of '09 and

4  continuing thereafter to in or about August 20, '09 in the

12:38:51  5  Houston Division of the Southern District.  And we have

6  somebody who pled open based upon an indictment that is

7  self-limiting on its very terms.

8      There is nothing in -- I just looked to see.

9  Mr. Balboni was mentioning it.  There is nothing here --

12:39:13  10  if I could just have one moment, Your Honor.

11      THE COURT:  Sure.

12      MR. GERAGOS:  -- that says, like I mentioned

13  before, 39 days over a two-month period, June, July,

14  August, which is what the substantive was.  A high of 156

12:39:31  15  patients in July.  There is $1.2 million to Barson's Wells

16  Fargo account, which I think they would concede is also

17  before August, and an unindicted co-conspirator on April

18  28th, 2009 from -- the only thing that they have got is

19  G.A., an unindicted co-conspirator, would and did wire

12:40:01  20  $9,700 from the Care Manage BOA account to Defendant

21  Barson on February 19th of 2010.

22      Now, none of that is listed.  None of those

23  allegations are contained in the substantive.  And what

24  they are asking you to do is sentence him on 19 of 20

12:40:21  25  counts which they concede are barred from using the

1    November 1st.  But somehow because Count 1 -- which I

2    would suggest is infirm on its face.  But other than that,

3    Count 1 can't revive Counts 2 through 20.  There is no

4    such -- I mean, there is no principle in the law where an

12:40:47    5    ex post facto application to particular counts can be

6    revived by an allegation of another count.  That just is

7    not in the law.  It's never been ex post facto.

8            And that was one of the reasons we had a revolution

9    against the king because the king did that.  They came

12:41:03    10   after you, and they kept saying there was not going to be

11   any end to this.  That's why we eliminated writs of

12   assistance.  That's why we have statutes of limitation.

13   That's why we have double jeopardy and things of that

14   nature.  That's why we created ex post facto.

12:41:18    15           So while I applaud Mr. Balboni and he has proved

16   everything I've said about him in terms of being a very

17   able and clever lawyer, he is not able to have the Court

18   sentence my client under the 2009 November 1st guidelines

19   because clearly they do not apply to Counts 2 through 20.

12:41:36    20           MR. BALBONI:  Your Honor.

21           THE COURT:  Yes.

22           MR. BALBONI:  This case could have been charged

23   with just the conspiracy.  There is no requirement that we

24   charge substantive counts, but we did.  And so now we have

12:41:46    25   to live with it.

1     That doesn't change the analysis however.  The

2  conspiracy count stands on its own, and it has a specific

3  beginning date and ending date.  The ending date brings us

4  past the effective date of the victim definition that

12:42:05  5  we're talking about here.

6     The -- I lost my train of thought for a second.  The

7  difference between the dates in the conspiracy versus the

8  health care fraud substantive counts is because, as the

9  Court knows, the crime of health care fraud occurs at the

12:42:24  10  time that the false claim is filed.  It's not a

11  conspiracy.  It's more like a bank fraud, if the Court

12  remembers those days.  It's every individual false claim

13  is a completed crime unto itself.

14     And so, that is why the scheme of years or the months,

12:42:46  15  I should say, of the scheme differ between the health care

16  fraud substantive accounts and the conspiracy to commit

17  health care fraud.

18     With respect to the substantive health care fraud

19  counts it's the filing of the false claim that is the

12:43:02  20  crime.  And so the filing of the false claims occurred

21  through August of 2009.  That doesn't mean the conspiracy

22  ended in August of 2009.  So that is why you have two

23  different sets of dates.  One for the conspiracy that

24  swallows up, if you will, the actual physical false

12:43:20  25  statements made to Medicare.

1          MR. GERAGOS:  Well, I agree that all the false

2    statements were made and ended in August.  In fact, on

3    Page 9 of the indictment they list the 20 instances.  All

4    20 instances are between the date of June 30th and August

12:43:40   5    5th of '09.

6          And then you move into Count 21.  That's a conspiracy

7    to violate the Anti-Kickback Statute.  And that is

8    specifically against my client.  And once again, the

9    conspiracy as alleged to my client is beginning in or

12:43:59  10    about June, 2009, the exact time being unknown, and

11    continuing thereafter to or in or about August of 2009.

12          So we now have once again -- I didn't realize it until

13    I looked again at Count 21 -- yet another affirmation of

14    the fact that the conspiracy that they allege my client is

12:44:18  15    involved in ended in August 2009.  They have listed the

16    false claims dates ending August 5th, 2009; and they can't

17    revive or swallow up, as they say, the conspiracy to the

18    other counts.  It is just there is no legal basis for

19    that.

12:44:35  20          I don't understand.  I mean, I know they posit it; but

21    they can't undue 200 years of ex post facto law by saying

22    we've got a conspiracy over here.  And so, therefore, we

23    want you to ignore the other 21 counts or the other 20

24    counts over here which are -- you're supposed to use under

12:44:55  25    a separate sentencing guideline.

1    That just doesn't make sense; and there is no legal

2    authority for it, that I'm aware of.

3         THE COURT:  I don't know that there is any

4    authority for using two different guidelines.

12:45:15   5         MR. GERAGOS:  It was one of the things I searched

6    for.  I admit to --

7         THE COURT:  I don't believe there is.  I don't

8    think they ever used two.  I don't think they ever do.

9         PROBATION OFFICER:  In the application under the

12:45:27  10    guidelines it says that you use the last date of the

11    offense of conviction as a controlling date for the ex

12    post facto purpose.  In this case he pled to the

13    conspiracy, which ended when we are in the 2009 guideline

14    manual.  That is what puts him in the 2009 guideline

12:45:45  15    manual.

16         MR. GERAGOS:  That's only for Count 1.  It does

17    not apply to Counts 2 through 21.

18         PROBATION OFFICER:  That is an offense of

19    conviction, which widens our data range.

12:45:56  20         THE COURT:  It widens the dates.

21         MR. GERAGOS:  What?

22         THE COURT:  The offense of conviction which

23    widens the date.  The way the guidelines work is you take

24    the last date of a count of conviction.  Well, the last

12:46:08  25    date of Count 1 is February of 2010, which puts you in the

1    2009 guidelines.

2              MR. GERAGOS:  Right.  For that -- for that count.

3              THE COURT:  No, not for that count.  It's all the

4    counts that they were found guilty of.  They go through

12:46:25    5    all the counts.  The last date, that happens to be

6    conspiracy.  So you use that for all of the counts.

7              MR. GERAGOS:  If you had no ex post facto

8    ramifications.  That's the problem.

9              THE COURT:  Well, I don't believe that there are

12:46:37    10   ex post facto ramifications because it's my understanding

11   -- and if I am wrong, I want you to tell me -- this

12   definition of "victim" was in the 2008 -- I mean, they

13   used the term "victim" in 2008.  Some courts were saying

14   victims were the beneficiaries, and some courts weren't.

12:46:59    15   So they just decided to clarify.  Isn't that what they did

16   was they just clarified what a victim was?  Am I wrong

17   about that?

18             PROBATION OFFICER:  I don't know if that's the

19   case.  I know that the definition was expanded in the 2009

12:47:13    20   manual.

21             MR. GERAGOS:  Right.

22             PROBATION OFFICER:  Like I said, the application

23   note is specific for ex post facto purposes.  The last

24   date of the offense of conviction is the controlling date.

12:47:27    25   The last date -- he did plead to the conspiracy that is

1    one of the offenses of conviction.

2         MR. GERAGOS:  Right here.  I have got it on Page

3    12 of our sentencing memo.  The Fifth Circuit expanded --

4    this is where we are arguing that the expanded victim

12:47:45    5    definition eliminates a defense.  Prior to the amendment

6    the Fifth Circuit found that the guidelines definition of

7    "victim" does not include individuals who are reimbursed

8    by an entity in a fraud scheme.  That was *United States*

9    *vs. Conner*, 537 F.3d 480 at 492.  That was 2008.  Finding

12:48:07   10    account holders were not victims under the sentencing

11    guidelines because they were reimbursed for losses by

12    credit card companies.

13         Now, here the only evidence that we have seen either

14    at trial, that I'm aware of, is that Medicare sustained

12:48:22   15    the pecuniary loss.  So under their holding in *Conner* that

16    would exclude the patients from being classified as

17    victims.  The amendment eliminated *Conner*, the *Conner*

18    holding of the Fifth Circuit.

19         That's why this argument is so apropos as we sit here

12:48:43   20    in the Fifth Circuit and why the analysis is not the

21    analysis that's proposed to you by probation or pretrial

22    because that counts as to Count 1.  That does not count as

23    to Counts 2 through 21 and the date of offense of

24    conviction.  I agree.  Count 1 you have -- you apply one

12:49:05   25    sentencing guideline.  But in order to try to expand that

                1    to Counts 2 through 21 you can't do it because under the

                2    law in *Conner* it ruled that that would -- it would

                3    eliminate the defense that was articulated in *Conner*.  And

                4    frankly, I think that's why they did the change on

    12:49:26    5    November 1st because of a lot of these Medicare

                6    prosecutions.  That's my supposition.

                7         But that's the problem that I think you articulated is

                8    how can I use two sentencing guidelines?  And then, I

                9    think that gets you to what you remember from law school

    12:49:41   10    they called the Rule of Lenity.  And when you have got --

               11    when you are on the heels of one of these statutory

               12    constructions, you don't go -- you don't lean towards the

               13    Government.  The old Rule of Lenity is you have to err on

               14    the side of the defendant.

    12:49:55   15         THE COURT:  Well, let me ask you this:  This case

               16    you cited from the Fifth Circuit was the Judge overruled?

               17    Did the Fifth Circuit -- did the Fifth Circuit reverse the

               18    District Court because the District Court counted the

               19    credit card holders as victims?

    12:50:11   20         MR. GERAGOS:  That's a good question.  I don't

               21    remember the -- the Fifth Circuit holding was as you said.

               22    I don't remember off the top of my head if the trial court

               23    ruled.  I would assume they did, but I don't know.  I

               24    don't want to just -- I don't want to guess.

    12:50:29   25         MR. BALBONI:  Your Honor, in *Conner* these were

1  victims of credit card fraud.  As we all know, the credit

2  card companies reimburse their card holders for fraud that

3  they are not a party to.  I can't -- and I apologize for

4  not having a case off the top of my head.  But the Court

12:50:48  5  began to talk about the fact that there is Fifth Circuit

6  precedent that victims -- I'm sorry, that Medicare

7  beneficiaries are, in fact, victims under the old

8  definition because they do suffer harm in that their

9  benefits are being used up by operations such as

12:51:10  10  Mr. Shakbazyan's.

11       They only have so many -- and this doesn't apply in

12  this case, but in situations like with the power

13  wheelchairs.  If they were -- as far as Medicare was

14  concerned, they got a powered wheelchair when they didn't

12:51:26  15  need it and Medicare not knowing that.  Three years later

16  they do need it; and when they try to get it, Medicare

17  says, "I'm sorry.  You already have one."

18       In this instance we don't have something that clear

19  cut; but what we do have is we have, as I said, there is

12:51:40  20  only so many -- they are only entitled to so many

21  different types of services per year under the plan of

22  allowance.  And because those services were being used up,

23  at least based on the claims being filed by the Barson

24  Clinic, they do actually suffer harm even though money

12:52:00  25  doesn't come directly out of their pocket.

1          MR. GERAGOS:  I'm not familiar with which case --
2    and I looked at most of these cases before today -- he is
3    referring to; and I did not -- that holding would, if
4    there is that holding in the Fifth Circuit, it would have
5    to be post *Conner* because *Conner* is the Fifth Circuit case
6    that was decided in 2008 and which, I believe, was the
7    precedent for them changing the guidelines.
8         So I don't know if Mr. Balboni is referring to a post
9    '09.  I'm assuming that's what must have happened.  It's
10   got to be conduct that was post November 1st, 2009,
11   because otherwise the Fifth would have been directly at
12   odds with one another and with *Conner* specifically.
13          MR. BALBONI:  I believe it predates *Conner,* Your
14   Honor.  I don't know that it is at odds, again, because
15   it's really two different scenarios.  One, you have credit
16   card holders who are literally being reimbursed for any
17   losses they may have suffered by the fraudulent use of
18   their cards as opposed to what I just described with
19   respect to Medicare beneficiaries.
20          THE COURT:  Do you have any idea what the name of
21   that case would be?
22          MR. BALBONI:  Not off the top of my head, Your
23   Honor.  No.  I apologize.
24          MR. GERAGOS:  Could I show counsel something?
25          THE COURT:  Sure.

1          (Sotto voce discussion between counsel.)

2              MR. GERAGOS:  I cited another case which was also

3     Fifth Circuit which was *United States vs. Gieger*,

4     G-i-e-g-e-r, 190 F.3d at 661, 664 and 665.  They found

12:54:01  5     there that the patients were not victims where the scheme

6     to submit false claims for ambulance services provided

7     them a free hospital ride; and if they suffered no medical

8     or financial harm, they can't be considered victims of a

9     medical fraud scheme.

12:54:16  10         So those are the two citable cases that are published

11    that I think deal with this directly head-on.  Absent some

12    case law other than that, I think the Court is, you know,

13    Your Honor, is bound under the applicable Fifth Circuit

14    law on the issue of this six level enhancement.

12:54:38  15             THE COURT:  Well, let me ask you this:  Are you

16    willing to concede that -- I believe -- I mean, I don't

17    have any documents before me.  So I don't know what it

18    says, but I know that -- I mean, I believe that the first

19    count, which is the conspiracy count, and it talks about

12:55:06  20    the 400-and-some-odd victims.

21             MR. GERAGOS:  It does.  It does.  It talks about

22    400 -- specifically, it talks about 429 patients were --

23    or Medicare was billed for 429 patients in 39 days or

24    something like that.

12:55:24  25             THE COURT:  And that was the object of the

```
 1  conspiracy?
 2          MR. GERAGOS:  Well, it's interesting --
 3          MR. BALBONI:  I believe this is manner and means,
 4  Your Honor.
 5          MR. GERAGOS:  Yeah.  I was going to say the --
 6  what -- it isn't listed in the -- they call it the manner
 7  and means and say, "Did cause Medicare to be billed for
 8  procedures involving 429 patients over 39 days over a
 9  two-month period."
10      The problem with that is that the Counts 2 through 20
11  which are -- incorporate the Paragraphs 1 through 6 of
12  Section A are self-limiting, as well.  So that is -- you
13  can't bootstrap it.  You can't use one sentencing
14  guideline for the Count 1 and a different guideline for
15  counts --
16          THE COURT:  That's my point.  I mean, Count 1
17  definitely includes the 429 victims.
18          MR. GERAGOS:  Except they don't characterize them
19  as victims.  It's submissions.  I mean, that's the --
20          THE COURT:  Okay.  All right.
21          MR. GERAGOS:  That's where the problem is.
22          THE COURT:  But the 2009 guideline which governs
23  the conspiracy count for sure defines "victims" as these
24  patients whose Medicare benefits were used.
25          MR. GERAGOS:  Correct.
```

1          THE COURT:  Okay.  So suppose I'm sentencing

2     Mr. Shakbazyan and I decide that he should be sentenced to

3     whatever, you know, and I give him that sentence as to

4     Count 1.

12:57:06    5          MR. GERAGOS:  What do you do with Counts 2

6     through 21?

7          THE COURT:  Well, I could do anything I wanted to

8     with Counts 2 through 21 --

9          MR. GERAGOS:  Post *Booker* you can --

12:57:15    10          THE COURT:  -- because of the sentence he gets

11     for Count 1, right?

12          MR. GERAGOS:  Post *Booker* you can do anything.

13     It's come full circle.

14          THE COURT:  Well, I realize that I could do

12:57:23    15     anything; but I'm trying to be reasonable about this.

16          MR. GERAGOS:  That's what -- I mean, in thinking

17     it through, that was one of the things that I had thought

18     about.  I mean, you know, far be it from me to be so

19     presumptuous as to tell you how to sentence someone.  I'm

12:57:39    20     here to suggest and point out what I think are problems,

21     but that I think -- the problem with that is that if you

22     have -- I go back to that Rule of Lenity.

23          If he would have received a lesser sentence six levels

24     lower on Counts 2 through 21 and just by application of

12:58:02    25     the later sentencing guideline he gets the higher because

 1     of six levels -- I mean, six levels is huge.

 2         Under the Rule of Lenity is that a problem?  Are we

 3     just taking what's a fundamental problem and escalating it

 4     and violating a basic rule of statutory construction, this

 5     Rule of Lenity?

 6         MR. BALBONI:  Your Honor, maybe -- I think this

 7     is where the Court is going.  I mean, a practical

 8     application of the 2009 guidelines would be the entire

 9     guideline being applied to Count 1 including the expanded

10     definition of "victim."  You would get, as the Court

11     pointed out, you would get your guideline range for that

12     particular sentence.  And then, you would continue to use

13     the 2009 guideline for the rest of the counts; but you

14     would just not use the enhanced definition because of the

15     potential ex post facto problem.  I think because of the

16     grouping you are ultimately going to get to the same

17     place.

18         THE COURT:  Get to the same place, yeah.

19         MR. BALBONI:  Right.

20         MR. GERAGOS:  I think the second step --

21         THE COURT:  What you want me to do is use the

22     2008 guideline for Count 1?

23         MR. GERAGOS:  Correct.  Or to sentence under the

24     2008 guideline for one of the other counts, and that's why

25     I keep bringing up the Rule of Lenity.  I don't -- I wish

1   I had a case that I could point you to that would say we

2   can pick and choose the guidelines that are appropriate.

3   I just don't think there is one.

4           THE COURT:  Yeah.  I wish you could, too.  I

12:59:45  5   don't think that's how it works.

6           MR. GERAGOS:  I tend to agree with you.

7   Logically, it doesn't make a whole lot of sense.  Why do

8   we go through all of these machinations and advanced

9   physics and geometry with the guidelines and then say,

12:59:56 10   "Well, okay.  Here is the Euclidean, and here is the

11   pre-Euclidean."  It doesn't make a whole lot of sense.

12   I'm with you on that.

13       But, obviously, I think if there is a more enhanced

14   version or a less Draconian version then I think under

01:00:11 15   statutory construction you take the lesser.

16           THE COURT:  I'll tell you what.  I now know why

17   the Ninth Circuit rules as it does on many cases.  It's

18   because of eloquent people like you.

19           MR. GERAGOS:  I don't know that I would take that

01:00:25 20   as a compliment.

21           THE COURT:  We are just arguing about something

22   that I don't think, for me, there is any solution but to

23   just come down one way and let you appeal it.

24           MR. GERAGOS:  I hate to do that to you.

01:00:37 25           THE COURT:  Oh, I know.  I know.  You don't have

1    any kind of plea agreement that says he can't appeal my

2    sentence.  So you are welcome to do that.  You are very

3    welcome to do that.  We'll solve this problem.

4              PROBATION OFFICER:  (Standing.)

01:00:47    5              THE COURT:  Yes, ma'am.

6              PROBATION OFFICER:  I just thought maybe for some

7    clarification -- I know he is trying to find a guideline

8    level that is lower.  However, the grouping rules do say

9    even if we were to look at both of the counts separately,

01:01:00   10    you pick the guideline that results in the highest offense

11    level for sentencing purposes.  So we would still be in

12    the 2009 guidelines.

13              MR. GERAGOS:  Right.  Except that still presents

14    you with the ex post facto problem.

01:01:13   15              THE COURT:  Well, that's something that probably

16    hasn't -- nobody in the Fifth Circuit has probably taken a

17    look at in a long time.

18              MR. GERAGOS:  I would agree with you because I

19    can't find anything.  I can't find anything in any Circuit

01:01:23   20    where anybody has had it.

21              THE COURT:  Right.  So I'm going to overrule that

22    objection and find that the 429 individuals were victims.

23    I don't even know where we are now.

24              MR. GERAGOS:  I want to say that was the last

01:01:40   25    other than the ones I incorporated by reference.

1          THE COURT:  You incorporated by reference the --

2     you have got the amount of restitution which you have

3     incorporated?

4          MR. GERAGOS:  Correct.

01:01:54   5          THE COURT:  Which I believe that was one that you

6     incorporated.

7          And you also objected to Paragraph 40, which goes back

8     to the grouping thing?

9          MR. GERAGOS:  Correct.

01:02:11   10          THE COURT:  And 43 you have already argued about.

11    43 is the loss calculation and which is a variation of the

12    restitution.

13          MR. GERAGOS:  Correct.  And then 44 is the one we

14    just talked about.

01:02:28   15          THE COURT:  Right.

16          MR. GERAGOS:  46 we have already dealt with.

17          THE COURT:  We have dealt with that one.

18          MR. GERAGOS:  This is a different -- a slightly

19    different argument.  I would just incorporate that

01:02:38   20    argument into what I had made before because that was

21    where --

22          THE COURT:  All right.

23          MR. GERAGOS:  It's in my paperwork.  So I don't

24    need to belabor that.

01:02:44   25          THE COURT:  Right.

1          MR. GERAGOS:  And then 48, 50 and 52 is they have

2     noted it.  The probation officer maintains the

3     calculations as amended are both applied appropriately and

4     calculated is the response.  So I would incorporate that

01:03:03   5     criminal history unless you want me to be heard on that.

6          THE COURT:  Well, I mean, I need you to touch on

7     all of the objections before I can do anything else.

8          MR. GERAGOS:  I think everything else has been

9     dealt with in the paperwork.  I don't need any further

01:03:17  10     argument.

11          THE COURT:  Any further argument?

12          MR. GERAGOS:  Right.  And when I said

13     incorporated, not only the paperwork but arguments by

14     co-counsel and codefendants.

01:03:26  15          THE COURT:  Right.  Yeah.  All right.  Well, I

16     believe that the objection to Part C, offender

17     characteristics, I believe I'm going to have to overrule

18     all of those.

19          And then you objected and said that the factors may

01:03:46  20     warrant departure, which I don't think there is going to

21     be an objection.  So I don't think I need to rule on that

22     one.

23          All right.  Having addressed all your objections

24     incorporated from the arguments of counsel or presented

01:04:01  25     here in the paperwork, I am going to overrule all those

1  objections, adopt the presentence report and the addendum

2  as my own, both the findings of fact and application of

3  the guidelines to the facts and find the total offense

4  level of 3, criminal history category Level 1, which gives

01:04:21  5  a guideline provision range of 97 to 121 months.

6      All right.  Anything else that you would like to say?

7          MR. GERAGOS:  No, Your Honor.  I have taken up a

8  lot of your time.  I have gone into your lunch hour.  I

9  appreciate your patience, and I would just ask that the

01:04:39  10  lower -- I'll submit it.  I'll let you do -- I think you

11  have made up your mind.  I'll let you sentence him as you

12  feel appropriate.

13          THE COURT:  All right.  Thank you.  Mr. Balboni.

14          MR. BALBONI:  Yes, Your Honor.  We, of course,

01:04:51  15  would also like you to sentence him to what you believe to

16  be appropriate.  We would like to suggest, Your Honor,

17  that given this defendant's role in this offense that he

18  be sentenced at the top end of the guideline minus a month

19  for a total of 120 months thereby not having to deal with

01:05:18  20  the stacking.

21          THE COURT:  Yes.

22          MR. GERAGOS:  Well, here I thought Mr. Balboni

23  was just going to submit.  I can't imagine -- I can't

24  imagine that for somebody who comes in and accepts

01:05:32  25  responsibility and doesn't put the Government through

1   their paces that that makes any sense.  I would urge the

2   Court to do the low end of that, given all the issues that

3   we have raised or that there are related to this.

4             THE COURT:  Okay.

01:05:51   5             MR. GERAGOS:  I submit.

6             THE COURT:  Mr. Shakbazyan, anything you would

7   like to say to the Court before I pronounce sentence?

8             DEFENDANT SHAKBAZYAN:  Yes, Your Honor.  First of

9   all, I'd like to apologize to Mr. Balboni; and I would

01:06:02   10   like to apologize to you, Your Honor, for my role in this

11   clinic.  And I also want to thank my pretrial officers,

12   Officer Corona and Officer DeGonia, for their

13   psychological and mental help to get me through my

14   situation that I have here.  And again, I'm sorry for my

01:06:27   15   actions.

16             THE COURT:  Anything else before I pronounce

17   sentence?

18             MR. BALBONI:  No, Your Honor.

19             MR. GERAGOS:  No.

01:06:35   20             THE COURT:  Edgar Shakbazyan is before the Court

21   this afternoon for sentencing after pleading guilty to one

22   count involving conspiracy to commit health care fraud, 19

23   counts of health care fraud, and one count of conspiracy

24   to violate the Anti-Kickback Statute.

01:06:48   25      He is identified as the manager of the clinic, who

1    along -- manager but actually organizer of the clinic, who

2    along with the co-conspirators participated in a scheme to

3    defraud Medicare.  Mr. Shakbazyan is identified as an

4    organizer, leader, manager, supervisor in this conspiracy

01:07:06    5    which involved giving directions to five or more criminal

6    participants including but not limited to Dennis B.

7    Barson, Jr.; Dario Juarez; Amber Wheeler; Pamela Devore;

8    Percy Bates; Frank Montgomery and G.A.

9        Through the use of Dr. Barson's Medicare provider

01:07:26    10   number Shakbazyan utilized the personal and identifying

11   information on at least 429 beneficiaries to submit

12   unauthorized and fraudulent claims for various diagnostic

13   tests which include rectal sensation tests and EMG studies

14   of the anal or urethral sphincter.  These tests were

01:07:45    15   medically unnecessary and were not requested by the

16   beneficiary or were not provided.

17       Shakbazyan is held accountable for fraudulently

18   billing Medicare approximately $2,152,455.  Medicare paid

19   $1,188,993.82.

01:08:05    20       Additionally, Shakbazyan paid kickbacks approximately

21   $100 per patient to the arbiters who would provide

22   patients to the clinic.

23       The large amount of money fraudulently obtained over

24   the course of two months is significant.  Although an

01:08:20    25   upward departure has been identified due to the

1  significant prison range and injunction of the factors

2  listed under 18 United States Code Section 3553(a), I

3  believe that in large part because of his plea of guilty a

4  sentence at the bottom of the guideline range is

01:08:40  5  appropriate.  This sentence would adequately reflect the

6  seriousness of the events, promote respect for the law,

7  provide deterrence to future criminal conduct and address

8  the defendant's background and characteristics.

9      A three-year term of supervised release would be

01:08:57  10  adequate to allow for monitoring and to provide the

11  defendant with the necessary time to address any criminal

12  monetary punishment imposed.

13      Based upon the defendant's financial profile and the

14  substantial amount of restitution owed it is -- I do not

01:09:10  15  think he has the ability to pay a fine in the prescribed

16  guideline range nor does he have the ability to pay a

17  reduced fine, and I will impose a special assessment for a

18  total of $2,100 mandated by statute.

19      Pursuant to the Sentencing Reform Act of 1984 it is

01:09:37  20  the judgment of the Court that the defendant, Edgar

21  Shakbazyan, is hereby committed to the custody of the

22  Bureau of Prisons to be imprisoned for a term of 97 months

23  as to each Counts 1, 2 through 20 and 21 to be served

24  concurrently for a total term of 97 months.

01:10:02  25      Upon release from imprisonment the defendant shall be

placed on supervised release for a term of three years.
This term consists of three years as to each Counts 1, 2
through 20 and 21, all six terms to run concurrently.
Within 72 hours of release from the custody of the Bureau
of Prisons the defendant shall report in person to the
probation office in the district to which the defendant is
released.

While on supervised release the defendant shall not
commit another Federal, State or local crime, shall comply
with the standard conditions as adopted by this Court
under General Order No. H-1996-10, abide by any mandatory
conditions required by law and shall comply with the
following additional conditions.

The defendant shall not possess a firearm, ammunition,
destructive device or any other dangerous weapon.  The
defendant shall cooperate in the collection of a DNA
sample from the defendant if the collection of such a
sample is authorized pursuant to Section 3 of the DNA
Analysis Backlog Elimination Act of 2000.

The defendant is required to provide the probation
officer access to any requested financial information, and
the defendant is prohibited from incurring new credit
charges or opening additional lines of credit without
approval of the probation officer.

The defendant is prohibited from possessing a credit

01:11:25

1    access device such as a credit card unless first

2    authorized by the probation officer.  The defendant shall

3    participate in a program, inpatient or outpatient, for the

4    treatment of drug and/or alcohol addiction, dependency or

5    abuse which may include but not be limited to urine,

6    breath, saliva and skin testing to determine whether the

7    defendant has reverted to the use of drugs and/or alcohol.

8        Further, the defendant shall participate as instructed

9    and as deemed necessary by the probation officer and shall

01:11:38 10   comply with all rules and regulations of the treatment

11   agency until discharged by the program director with the

12   approval of the probation officer.

13       The defendant shall further submit to such drug

14   detection techniques in addition to those performed by the

01:11:53 15   treatment agency as directed by the probation officer.

16       The defendant will incur costs associated with such

17   drug/alcohol detection and treatment based on ability to

18   pay as determined by the probation officer.  It is further

19   ordered that the defendant pay restitution in the amount

01:12:06 20   of $1,188,993.82 to Medicare, payable to the following

21   address:  CMS Division of Accounting Operations; 7500

22   Security Boulevard; Mail Stop C3-1-03; Baltimore, Maryland

23   21244-1850.

24       It is further ordered that the defendant is jointly

01:12:28 25   and severally liable with Dennis B. Barson, Jr., Criminal

1  No. 4:13-CR-367, Defendant 1, and Dario Juarez,

2  4:13-CR-367, Defendant 2, to pay restitution in the amount

3  of $1,188,993.82 to Medicare.

4      The defendant's restitution obligation shall not be

5  affected by any restitution payments that may be made by

6  other defendants in this case except that no further

7  payment shall be required after the sum of the amounts

8  paid by all the defendants has fully covered all the

9  compensable losses.

10      It is further ordered that the defendant shall pay to

11  the United States a special assessment of $2,100.  The

12  Court finds that the defendant does not have the ability

13  to pay a fine and will waive the fine in this case.

14  Having assessed the defendant's ability to pay, payment of

15  the total criminal monetary penalties shall be payable

16  immediately and the defendant shall make a lump sum

17  payment of $2,100 due immediately and then the balance due

18  on the whatever amounts are not immediately payable.  The

19  balance due will be 50 percent of any wages earned while

20  imprisoned in accordance with the Bureau of Prisons Inmate

21  Financial Responsibility Program.

22      Any balance remaining after release from imprisonment

23  shall be due in monthly installments of at least

24  10 percent of the defendant's gross income to be changed

25  during supervision, if needed, based on the defendant's

1    changed circumstances or $200 per month, whichever is

2    greater, to commence 30 days after release from

3    imprisonment to a term of supervision.  Payment is to be

4    paid to the United States District Clerk Southern District

01:14:15  5    of Texas.

6        Mr. Shakbazyan, to the extent you have not waived your

7    right to appeal you have a right to appeal your conviction

8    and your sentence.  If you do not have the funds to pay

9    for an attorney, one will be provided for you at the

01:14:24  10   Government's expense along with any transcripts or other

11   documents necessary for such an appeal.

12       Is there anything else?

13       MR. GERAGOS:  Could we also -- for the record,

14   objection to the sentence, which I think we have to do.

01:14:35  15       Could the Court make a recommendation that he

16   self-surrender or serve his time at Lompoc, which is a

17   facility in California, which is in proximity to his

18   family?

19       That it also be a recommendation because they won't

01:14:50  20   just do it.  You have to go through the hoops on the drug

21   program.  He has got a demonstrable drug addiction that he

22   has been working through.

23       And then self-surrender.  I have talked with the U.S.

24   attorney about this.  One of the things we're going to do

01:15:04  25   is we're going to stipulate -- the other U.S. attorney who

1    is back there -- stipulate to the preliminary order and

2    then hopefully within the next -- I have related to them I

3    know where this property is.  It's a fairly hot real

4    estate market.  Try to get that property sold immediately

01:15:22    5    so that the moneys can come back to the United States

6    Government.  And then, we're in the process of stipulating

7    or hoping to come to a settlement once we have sold the

8    property.  I need his assistance to do that.  And I don't

9    think the Government has got any objection to that.

01:15:41    10          MR. BALBONI:  The United States has no objection

11    to self-surrender, Your Honor.

12          THE COURT:  All right.  Mr. Shakbazyan, do you

13    understand that you will be asked to sign a document that

14    indicates that you will report to whatever facility you

01:15:49    15    are designated to on the day and time that is in an order

16    that will come a little bit later?  Do you understand

17    that?

18          DEFENDANT SHAKBAZYAN:  Yes, Your Honor.

19          THE COURT:  All right.  As far as your

01:16:04    20    objections, they are overruled.

21        And then, I will recommend to the Bureau of Prisons

22    that Mr. Shakbazyan be designated to the facility in

23    Lompac, which is close to his home, which you know they

24    don't have to follow my recommendations.

01:16:18    25          MR. GERAGOS:  I understand.

1        THE COURT:  And also, I will recommend to the

2   Bureau of Prisons that Mr. Shakbazyan be allowed to

3   participate in the 500-hour drug treatment program while

4   he is incarcerated.  Again, they don't have to follow my

01:16:29    5   recommendations, --

6        MR. GERAGOS:  I understand.

7        THE COURT:  -- as you noted.

8        MR. GERAGOS:  I understand.

9        THE COURT:  Is there something else?

01:16:35   10        MR. BALBONI:  Yes, Your Honor.  Again, just to

11   make sure we're clear on something, so Ms. Rollinson

12   doesn't yell at me when we get back to the office with

13   regard to the forfeiture, that again, in this instance, we

14   have two motions for preliminary order of forfeiture.  One

01:16:46   15   being for the house, which I believe is the stipulation;

16   and there is also one for a personal money judgment in the

17   amount of the total loss, which is the $1,188,993.82.

18        MR. GERAGOS:  You have already ordered that as

19   restitution.

01:16:58   20        THE COURT:  Okay.

21        MS. ROLLINSON:  There are separate aspects.  So

22   I'm not sure if we're going to have a separate forfeiture

23   hearing or if it's going to be short now that we have kind

24   of agreed on the house.

01:17:13   25        THE COURT:  Well, okay.  I will -- you have

1   stipulated to Mr. Shakbazyan's aspect of this forfeiture

2   order, right?

3          MR. GERAGOS:  That's correct, Your Honor.

4          THE COURT:  All right.  So I can sign -- well,

01:17:28  5   that's not it.  You have got both of those orders?

6       (Discussion off the record.)

7          MS. ROLLINSON:  Do you want me to clarify on the

8   orders, Your Honor?

9          THE COURT:  Yes.

01:18:01  10          MS. ROLLINSON:  I moved for money judgments, and

11   I have three separate orders on money judgments.  We

12   misunderstood each other.

13          THE COURT:  We can't find those in our system.

14          MS. ROLLINSON:  I have the money judgment orders,

01:18:11  15   and I have them with me.  I gave them as to Mr. Juarez;

16   and I have the other two, also.

17          THE COURT:  I have got Mr. Juarez.  I need the

18   other two.  I would like to have the other two, also.

19          MS. ROLLINSON:  Okay.  And then separately is the

01:18:20  20   house order which applies to all three defendants, and it

21   cuts off all three defendants' rights in the house.  I

22   don't think they are claiming any.  I would think that

23   that would be okay with everybody.

24          MR. GERAGOS:  I don't think anybody --

01:18:35  25          THE COURT:  No one is claiming the house

```
 1   except --
 2            MR. GERAGOS:  Mr. Shakbazyan.
 3            THE COURT:  -- Mr. Shakbazyan.
 4            MR. GERAGOS:  He is going to facilitate the sale,
 5   and I'll keep the Government apprised of where we are at
 6   with that.
 7            MS. ROLLINSON:  I'm sorry.
 8            MS. FRAZIOR:  We have Shakbazyan here.  Do you
 9   have Juarez already?  You have Juarez' order already; is
10   that correct?
11            MS. ROLLINSON:  We handed up Mr. Juarez' earlier,
12   and now we have Shakbazyan and Barson.
13            THE COURT:  Yes.  Yes.  Yes.  Okay.  Okay.  Now,
14   what I'm going to do now is I'm going to sign this
15   preliminary order of forfeiture, okay, with the
16   understanding that this is just about the house and that
17   it really applies only to Mr. Shakbazyan.  The other two
18   defendants are not claiming any part of the house; is that
19   right?
20            MR. GERAGOS:  That's my understanding as well.
21            MS. ROLLINSON:  I just have their names on there,
22   Your Honor, because it's the proceeds of the conspiracy.
23   So it cuts off the rights in the house to all three of
24   them.
25            THE COURT:  Okay.  All right.  So this should be
```

01:18:44    5
01:18:59   10
01:19:12   15
01:19:50   20
01:19:59   25

1    attached to each of the judgments; is that right?

2                MS. ROLLINSON:  Yes, Your Honor.

3                THE COURT:  All right.

4                MR. GERAGOS:  Yes, because the proceeds at some

01:20:09    5    point will be applied to the money judgment.

6                MS. ROLLINSON:  They would be applied to the

7    money judgment, not necessarily to restitution until we go

8    visit.

9                THE COURT:  Right.  But the rules require that

01:20:19   10    any order of forfeiture be attached or they be made part

11    of the judgment.

12                MR. GERAGOS:  Correct.

13                MS. ROLLINSON:  Yes, Your Honor.

14                THE COURT:  All right.  So we have got that done.

01:20:28   15    Then we have an order imposing personal money judgment on

16    Mr. Shakbazyan?

17                MS. ROLLINSON:  Yes, Your Honor.

18                THE COURT:  Is there any objection to that?

19                MR. GERAGOS:  No.  That is -- we're stipulating

01:20:40   20    to that.

21                MS. ROLLINSON:  To the money judgment order?

22                MR. GERAGOS:  The money judgment.

23                MS. ROLLINSON:  Okay.

24                THE COURT:  Okay.  So we have got those two for

01:20:59   25    Mr. Shakbazyan.  Now, as far as the --

```
 1              MR. GERAGOS:  Could I ask -- they need him
 2   upstairs.  Can we be excused, Mr. Shakbazyan and myself;
 3   and he goes upstairs to Floor 10 or something?
 4              THE COURT:  Sure.  Yes.
 5              MR. GERAGOS:  Thank you very much.
 6              THE COURT:  Thank you.
 7              MR. WILLIAMS:  Judge, I may be able to clean it
 8   up a little bit.  With respect to the personal money
 9   judgment as to Barson, we can stipulate that we will rest
10   on our pleadings.  We're not going to require any evidence
11   in light that the other defendant is not going to.  So
12   we'll just rest on our pleadings as they stand.
13              THE COURT:  All right.  So Dr. Barson I will sign
14   that.
15              MR. WILLIAMS:  Very well, Your Honor.
16              THE COURT:  Your objections are there?
17              MR. WILLIAMS:  Yes, Your Honor.
18              THE COURT:  You rest on your pleadings.  I'm
19   going to overrule your objections and sign the order.
20              MR. WILLIAMS:  Very well, Your Honor.  We have
21   another hearing in Judge Hoyt's court.  May we be excused?
22              MR. HILDER:  One other matter, though, as it
23   pertains to Mr. Barson, Judge.  Just on the judgment we
24   would ask that the Court send Mr. Barson to alcohol --
25   make the recommendation for the alcohol abuse program.
```

01:21:17
01:21:32
01:21:47
01:21:57
01:22:11

1       THE COURT:  I will.  It's the same 500-hour drug

2   and alcohol program that they have standard in the Bureau

3   of Prisons.  I will make a recommendation that he be

4   allowed to participate in that program while he is

01:22:28   5   incarcerated.

6       MR. HILDER:  Thank you, Judge.  Appreciate it.

7       THE COURT:  You may be excused.

8       MR. DUPONT:  Does that include me, Your Honor?

9       THE COURT:  No.  You have to tell me what your

01:22:44   10  position is on this order imposing personal money judgment

11  on Mr. Juarez.

12      MR. DUPONT:  It's the same as Mr. Williams, Your

13  Honor.

14      THE COURT:  You stand by your pleadings?

01:22:52   15      MR. DUPONT:  Yes.

16      THE COURT:  I overrule any objections contained

17  in your pleadings and sign this order imposing monetary

18  judgment.  Thank you very much.  You may be excused.  We

19  stand adjourned.

20      (Proceedings adjourned at 1:22.)

21  Date:  September 25, 2015

22              **COURT REPORTER'S CERTIFICATE**

23

24      I, Laura Wells, certify that the foregoing is a

25  correct transcript from the record of proceedings in the

1    above-entitled matter.

2

3                           /s/ Laura Wells
                        _____

4                       Laura Wells, CRR, RMR

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25